## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

KYLIE MCKENZIE,

      Plaintiff,                    CASE NO: 6:22-cv-00615-PGB-LHP

vs.

UNITED STATES TENNIS ASSOCIATION
INCORPORATED, and USTA PLAYER
DEVELOPMENT INCORPORATED,

      Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, KYLIE MCKENZIE, hereby files this Complaint against United States Tennis Association Incorporated ("USTA") and USTA Player Development Incorporated ("USTA Player Development"), and further states the following:

## JURISDICTION, VENUE, AND PARTIES

1.    Plaintiff is a citizen of Maricopa County, Arizona.

2.    Defendant USTA is a New York Corporation with its primary place of business in the City of White Plains, State of New York, and is therefore a citizen of New York.

3.    Defendant USTA Player Development is a New York Corporation with its primary place of business in the City of Orlando, State of Florida, and is therefore a citizen of New York and Florida.

4.     The Court has subject matter jurisdiction of this action pursuant to 20 U.S.C. §1332(a) because the parties are citizens or entities from different states, and the amount in controversy exceeds $75,000.

5.     Venue is proper in the Orlando Division of the Middle District of Florida pursuant to 28 U.S.C. §1391(b) and (c) because the events and omissions giving rise to the claim occurred in this District, and Defendants are corporations subject to the personal jurisdiction of this District.

## FACTUAL ALLEGATIONS

6.     Defendant USTA is the National Governing Body ("NGB") for the sport of tennis and the recognized leader in promoting and developing the sport's growth on every level in the United States. USTA has averaged over 700,000 individual members over the past 10 years.  It collects dues from its individual members.

7.     As NGB for the sport of tennis, USTA selects the players and coaches that represent Team USA at the Olympic Games and other international tennis events.  To be a member of Team USA, a player must be in good standing with the USTA.

8.     Defendant USTA Player Development is an affiliate of USTA.  The mission of USTA Player Development is to educate and train young people in the sport of tennis through a clearly defined training structure and competitive pathway as well as through the implementation of a comprehensive coaching philosophy and structure.  USTA funds USTA Player Development to perform this

mission, which is a part of the overall USTA mission.  USTA is the sole member of USTA Player Development and elects the directors of USTA Player Development pursuant to that organization's bylaws. As sole member, USTA has the right to remove USTA Player Development directors with or without cause, to fill vacancies in its Board of Directors, and to amend its certificate of incorporation and its bylaws. Additionally, USTA has the right to approve or ratify certain decisions of the Board of Directors of USTA Player Development (such as the decision to merge or dissolve).

9.     USTA and USTA Player Development (hereinafter referred together as "Defendants") develop young, talented tennis players at their National Training Centers in Carson, CA, Boca Raton, FL, and Orlando, FL.  These National Training Centers provide programming for aspiring players to train during the day and work out with USTA's strength and conditioning staff after tennis workouts.

10.     In 2010, the United States Olympic Committee ("USOC")[1] notified its NGBs, including USTA, of the need to immediately strengthen child protection measures after several sex abuse allegations across the Olympic movement surfaced. Beginning in 2011, the USOC recommended NGBs expand disqualifying criteria for prospective coaches. The USTA resisted implementing many of the USOC's recommended changes.

---

[1] The USOC is a federally chartered nonprofit corporation whose central function is to coordinate amateur sports throughout the county for athletes hoping to one day compete in the Olympics. In this role, USOC certifies and oversees each sport's national governing body, which are the entities responsible for conducting and administering the respective sports in the United States.

11.     In late 2012, the USOC again reiterated the need to strengthen child protection measures given the "crisis" of coaches molesting minor athletes.  Once again, USTA ignored the USOC's recommendations.  As a result, the USOC began mandating its NGBs implement minimum child protection measures.  In response, USTA protested vociferously, telling USOC's CEO Scott Blackmun through written correspondence that while it was generally "supportive" of making the sport safer, the implementation of these measures would greatly increase liability exposure for NGBs in that they would effectively create higher duties of care.

12.     When USOC was recommending abuse-prevention policies, it wanted USTA to implement a policy prohibiting its coaches from having romantic relationships with their female athletes. The USOC knew permitting these relationships would enable coaches to use their position of power to engage in inappropriate sexual advances towards their vulnerable athletes. While most NGBs agreed, USTA vehemently opposed this policy.  USTA opposed it because there were several coaches in its sport dating their athletes. Highly respected tennis coach Judy Murray (mother of Wimbledon champions Andy Murray and Jaime Murray) said it was an open secret that there was abuse in the women's game.  In an interview with The Guardian, Ms. Murray stated: "I think anybody would tell you that there are examples . . . I think everybody who's on the circuit would be able to name you something that isn't quite right.  It's very easy for a young, inexperienced player to be taken advantage of . . . ."  To this day, USTA has not prohibited coaches from engaging in romantic relationships with their athletes.

13.     When the USOC forced USTA to implement minimum athlete protection measures in or about 2013, USTA created its "Safe Play" program. According to USTA's Safe Play Conduct, Policies and Guidelines:

> Tennis, the sport of a lifetime, is a great way to stay fit, make friends and have fun. However, tennis, like all sports, can result in high-risk environments for misconduct, including physical, emotional, and sexual abuse. All forms of misconduct are unacceptable to the [USTA] and are in direct conflict with the USTA's values and missions as the [NGB] for the sport of tennis in the United States. The USTA is committed to creating a safe and positive environment for every athlete's development in an environment free of misconduct.

By 2014, USTA members and employees had to comply with USTA's Safe Play Conduct, Policies, and Guidelines.

14.     Pursuant to its Safe Play program, USTA required its employees (and the individuals USTA formally authorizes to serve in a position over or have regular contact with athletes) to complete a criminal background screen at least every two years.  This includes the staff at Defendants' National Training Centers.  If USTA becomes aware of any potential criminal activity concerning an adult member, whether through information received from the media, third parties, or otherwise, USTA retains the right to conduct additional background screening, and to immediately withdraw the adult member's good standing status.

15.     However, as stated previously, USTA did not prohibit or limit its coaches from engaging in romantic relationships with their adult athletes.

16.     Plaintiff was born on March 21, 1999.  At all relevant times, Plaintiff was a USTA member.

17.    As an active USTA member, Plaintiff was subject to Membership Terms & Conditions, including an agreement that all parties were subject to, and required to comply with, the USTA's Safe Play athlete abuse prevention policies and program.

18.    Plaintiff has been playing tennis since she was 3 years old.  From an early age, Plaintiff aspired to become a professional tennis player.  As Plaintiff thrived at a young age in tournaments, Defendants began to take notice.  When Plaintiff was twelve (12) years old, a USTA national coach recruited Plaintiff to train at the USTA National Training Center in Carson, CA, also known as USTA Training Center West.  This coach persuaded Plaintiff and her parents to allow Plaintiff to leave her home in Arizona to train full-time at USTA Training Center West.

19.    Plaintiff became a full-time athlete at USTA Training Center West. There, Defendants paid for her coaching, training, and medical care.  Defendants also transported Plaintiff to and from all her tennis tournaments and compensated her for travel expenses such as flights, hotels, and food.  At times, Defendants paid for Plaintiff's living costs in California, including her rent.

20.    The USTA national coach who recruited Plaintiff became her full-time coach.  He told Plaintiff she would be the next star in tennis and that she needed to make hard sacrifices, including spending less time with family, to reach that goal.  He sought to control Plaintiff's day-to-day activities.  He often kept her alone after practice after everyone left to engage in long, personal conversations with her.

He discouraged her from playing college tennis and completing her schoolwork. He instructed Plaintiff to remove the phone numbers of boys from her phone and instructed boys not to talk to Plaintiff. He reprimanded Plaintiff when she first kissed a boy at the age of 15.  Other USTA players joked that this USTA national coach was "obsessed" and "in love with her."  Plaintiff recalls hearing a discussion between two parents at USTA Training Center West commenting that the relationship between her and the coach was unusual.  Eventually, Plaintiff ceased training at this center due to the coach's behavior and trained at home in Arizona.

21.     Later, but when she was still a minor, Defendants urged Plaintiff again to train at their National Training Center in Boca Raton, FL, where the best female players from the USTA were training.  At the time, Plaintiff was one of the best young tennis players in the country.  Plaintiff, with her parents' approval, moved to Florida and became a full-time athlete at the Boca Raton USTA National Training Center.  There, Defendants covered her coaching, training, medical care, and lodging. Similar to her experience in Southern California, Defendants transported Plaintiff to and from all of her tennis tournaments and compensated her for travel expenses such as flights, hotels, and food.

22.     When Plaintiff was sixteen (16) years old, she traveled to a tournament in Waco, TX, under the supervision of a USTA coach who was in his 30s. After her tournament match, this coach took Plaintiff to dinner and asked her to sit at the bar with him. He asked her if she wondered if people thought they were together. During this trip, this USTA coach asked Plaintiff to take his dirty laundry

from his hotel room and wash it with her clothes. After cleaning his clothes, Plaintiff gave them to the coach and then went to her hotel room. Her coach then texted her "I have your thong." Plaintiff apologized for the mistake through text and then the coach responded that he was just kidding. For obvious reasons, Plaintiff felt this was strange.

23.     In late 2016, Plaintiff suffered a significant shoulder injury. Plaintiff rehabbed the injury from her home in Arizona. In or about August of 2018, Plaintiff moved back to Florida when she was nineteen (19) years old to train at Defendants' newly opened training center in Orlando, Florida, referred to as the USTA National Campus. According to USTA's website, USTA National Campus is a 100-plus-court, state-of-the-art facility serving as the touchstone for tennis in the United States.

24.     At the USTA National Campus, Plaintiff began working with USTA national coach, Anibal Aranda [age 34], around October of 2018. Coach Aranda had been employed as a coach by Defendants for about seven (7) years and was an employee of Defendants at all material times.

25.     Coach Aranda expressed to Plaintiff he enjoyed working with her and saw a lot of potential in her. Coach Aranda said he could make her great even after her injury. After training a few times together on the hard courts, Coach Aranda began scheduling practices on the last red clay court in the very last row of the facility at 11:00 am. Other players and coaches would be finishing their morning practices around this time. The red clay courts were the only courts not visible from

the player development building. Coach Aranda began building Plaintiff up by constantly complimenting her. Similar to her coach in Carson, CA, he engaged in a personal conversation with her trying to get her to open up. Coach Aranda knew Plaintiff had been struggling from her injury, that her parents struggled financially, and that Plaintiff needed training from Defendants to keep playing tennis. Coach Aranda promised she would be successful if she stuck with him.

26.    Later, Coach Aranda began telling Plaintiff she was too skinny and she needed to get stronger. On one occasion, Coach Aranda put his hands under Plaintiff's shirt, grabbed her stomach and waist, rubbing it while saying "see, you're too skinny."

27.    As Coach Aranda continued to train Plaintiff, his physical contact with her escalated.  He began sitting directly next to her on the bench. While sitting next to her, he would lean into her and rest his head on her upper thigh and rub it before he would get up. He often put his hand on top of her hand while she was holding the phone or tried to intertwine his arm with her extended arm while she was holding her phone.

28.    In late October of 2018, Coach Aranda became more physical with Plaintiff under the guise he was helping with her serving technique.  Coach Aranda would stand directly behind Plaintiff so that his full body was pressed up against her back and butt, and then he grabbed her hips with his hands. As Plaintiff practiced the serve loading motion, Coach Aranda's fingers would move lower and lower down her groin and underwear line with each repetition as his body pressed

tightly against her.  With each serve repetition, Coach Aranda would press harder and harder against Plaintiff's body to the point where Plaintiff would almost tip forward and lose her balance.  Coach Aranda had Plaintiff undergo this motion for 10 to 15 repetitions in multiple sets nearly every day of training. On one occasion, Coach Aranda knelt in front of Plaintiff while she was working on loading her serve. His face looked directly at Plaintiff's vaginal area while he held her hips with his fingers in her groin. After these serve repetitions, Coach Aranda would put his hand on Plaintiff's back and then slide it down to her butt for a few seconds before pulling away. With each practice, Coach Aranda's physical contact became more invasive.

29.    On Friday, November 9, 2018, Coach Aranda sat next to Plaintiff on the bench after a practice. He asked Plaintiff if she thought she was beautiful. He then asked questions about Plaintiff's body.  He asked her who she wanted to look like on the professional tennis tour.  Plaintiff mentioned a particular tennis player because she is lean and fit, and Coach Aranda responded, "you want to be like her and wear your skirts so short with your butt hanging out." Later during that conversation, Plaintiff looked away from Coach Aranda while trying to think of an answer to one of his questions.  At the time, she had a towel over her lap and Coach Aranda's hand was resting on her upper thigh.  As Plaintiff looked away from him, Coach Aranda slid his hand under her towel and started rubbing her vagina with his fingers. Plaintiff pushed Coach Aranda away in shock and fear. Coach Aranda then grabbed her calves and knees aggressively trying to massage them.  He tried

to get in Plaintiff's face so she would look at him.  Plaintiff tried not to look at him, not knowing what to do.  He then asked Plaintiff what she wanted him to be and Plaintiff replied she only wanted him to be her tennis coach.  Coach Aranda angrily responded, "oh that's it? . . . if you don't want to talk to me that's fine, say it to my face." Plaintiff was shocked and scared. Later that day, Coach Aranda started talking about how he wanted to help get Plaintiff sponsors and how Plaintiff was transitioning to becoming a real professional.  He said he could get her discounted clothes. Plaintiff gave him short answers as she sat hunched over on the bench. Coach Aranda stood up above her and tried to hug her while she sat down.  Plaintiff tried to avoid the hug without success.  Plaintiff was extremely upset after that day and was shocked that her coach betrayed her in this manner.

30.    The following day, Plaintiff reported Coach Aranda's sexual misconduct to Defendants. Thereafter, the United States Center for SafeSport ["SafeSport"] investigated his conduct. After months of investigation, SafeSport found by a preponderance of the evidence Coach Aranda engaged in an escalation of inappropriate conduct towards Plaintiff including: (a) complimenting her physical appearance; (b) touching her body while they reviewed video or photographic footage from their practices, including leaning his body into hers while sitting next to her, putting his hand over hers while she held her phone, and intertwining his arm with her arm while she held her phone; (c) touching her bare waist and stomach on one occasion while joking about her being too skinny and resting his hand on her back and buttocks on one occasion; (d) touching her in a

manner that made her uncomfortable while working on her serving technique, including pressing his body against hers, putting his hands on her hips moving them towards her crotch, and kneeling in front of her on one occasion; (e) touching and rubbing her vulva over her clothes on November 9, 2018.

31.    SafeSport's investigation also revealed Coach Aranda had a history of inappropriate behavior with a young female in Defendants' organizations.  In or about 2015, Defendants' Coordinator of Coaching Education and Sport Science ["Jane Doe"][2] and a group of USTA and/or USTA Development employees, including Coach Aranda, were in New York for the U.S. Open.  The group of employees went to dinner together and then a dance club later that evening.  Coach Aranda started to dance behind Jane Doe "grinding up on" her and rubbing her vagina on the outside of her clothes.  Jane Doe removed herself from the situation and left the club, but Coach Aranda followed Jane Doe outside the club and tried to get in a cab with her. Jane Doe got another coworker to ride with them so that she would not be alone with Coach Aranda.  Jane Doe did not report the incident to any person in Defendants' organizations, and went on to become Defendants' Senior Manager of Player Development, Events, and Programming at the USTA National Campus.  She went on to work alongside Coach Aranda and Plaintiff.  At no point did Jane Doe take any measures to prevent Coach Aranda from engaging in inappropriate behavior with Plaintiff or any of his female athletes.

---

[2] Due to the sensitive nature of these sexual assault allegations and out of respect for her privacy, Plaintiff is identifying this woman by a pseudonym instead of her real name.

32.     As a result of his sexual misconduct, Defendants terminated Coach Aranda's employment and prohibited him from returning to the USTA National Campus.

33.     Defendants enter contracts with the athletes trained by USTA including Plaintiff. Pursuant to such contracts, Defendants were contractually obligated to provide services, including all coaching services offered at USTA training facilities, in a safe environment free of emotional, physical, and/or sexual misconduct. Defendants' contractual obligation to provide services in a safe and non-abusive manner was a non-delegable duty that could not be transferred to any third party.

34.     At all material times the USTA coaches, including Coach Aranda, were agents of Defendant USTA.

35.     At all material times the USTA coaches, including Coach Aranda, were employees of Defendant USTA Player Development.

## COUNT I: NEGLIGENT HIRING, SUPERVISION, CREDENTIALING, AND RETENTION

36.     The Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 35.

37.     Defendants had a duty of care to Plaintiff, as well as to all athletes when hiring, retaining, supervising, and evaluating its prospective employees, including Coach Aranda, to timely, adequately, and appropriately investigate, heed, and act on all reasonable suggestions and information that its coaches had

the propensity to, and/or had actually, inappropriately engaged in inappropriate sexual innuendo and touching of female athletes in the course and scope of their employment and/or agency relationship with Defendants.

38.     Defendants had a duty of care to Plaintiff, as well as to other athletes, to prohibit Coach Aranda from privately interacting with Plaintiff as well as with other female athletes, given his propensity to sexually batter, threaten, harm, assault, harass, and otherwise mentally, physically, and emotionally injure female athletes.

39.     As of August of 2018, Defendants knew or reasonably should have known of Coach Aranda's propensity to sexually batter, threaten, harm, assault, and otherwise mentally, physically, and emotionally injure female athletes.

40.     At all material times, Defendants knew that its coaches were being placed in a position of employment where they would have unfettered access to vulnerable female athletes without direct supervision, oversight, or monitoring.

41.     Coach Aranda used his position as a USTA coach to gain access to vulnerable female athletes and to verbally and physically assault and commit sexual battery against Plaintiff and other women.

42.     Defendants knew or should have known that Coach Aranda had committed sexual battery against other female patients prior to August of 2018 while employed by Defendants and that Coach Aranda had a propensity to harass, assault and commit sexual battery against female athletes and to otherwise physically and emotionally threaten, harm, and injure such athletes. Defendants'

Coaches had a duty to report the prior abuse by Coach Aranda to Defendants and players.

43.     Despite the known history of sexual abuse by Coach Aranda Defendants continued to permit Coach Aranda's unfettered access to vulnerable female patients without a chaperone or other close personal supervision.

44.     Defendants failed to investigate the claims that Coach Aranda had assaulted, battered, and otherwise inappropriately touched female patients prior to August of 2018. Had Defendants conducted a reasonable investigation, the investigation would have revealed that Coach Aranda had a propensity to harass, assault and commit sexual battery against female athletes, and was otherwise unsuitable for the duties and responsibilities of his position as a coach.

45.     Defendants had a duty of care to Plaintiff, as well as to other female patients, to protect Plaintiff and its female patients and to otherwise ensure the safety of its athletes, including Plaintiff, from being assaulted and battered by their employees and/or agents, including Coach Aranda.

46.     Assaults and sexual batteries of the sort suffered by Plaintiff were entirely preventable had Defendants timely, adequately, and appropriately investigated the prior conduct of Coach Aranda including his prior inappropriate contact with other female athletes prior to August of 2018, and intervened by prohibiting Coach Aranda's continuing unfettered and unsupervised access to vulnerable female athletes, including Plaintiff.

47.    In breach of their duty of care, Defendants negligently retained Coach Aranda when they knew, or should have known, of his propensity to sexually harass, assault, batter, and otherwise harm and injure vulnerable female athletes, including Plaintiff.

48.    In breach of their duty of care, Defendants were also negligent in supervising  Coach Aranda by 1) failing to engage a chaperone for any and all of Coach Aranda's travel and coaching interactions with Plaintiff and Coach Aranda's other female athletes; 2) failing to require Coach Aranda to engage a chaperone for all interactions with female athletes; and 3) allowing Coach Aranda to continue to supervise, chaperone and coach female athletes in private and without a chaperone after being provided notice that Coach Aranda was inappropriately touching and inappropriately engaging in sexual communications with athletes.

49.    Additional negligent and careless acts and omissions of the Defendants include but are not limited to:

a.  Failing to establish reasonable criteria for the granting of, withdrawal, or reduction of coaching assignments, roles, and duties;

b.  Failing to exercise reasonable care to ensure that the duty of accountability of the USTA coaching staff for athlete safety is properly discharged;

c.  Failing to exercise reasonable care to detect when actions or behavior of a coaching staff member are detrimental to athletes;

d.  Failing to exercise reasonable care to detect that actions or behavior of a USTA coaching staff member demonstrate noncompliance with USTA Bylaws, Rules and Regulations or Policies and Procedures, and State Law;

e.  Failing to exercise appropriate and reasonable care in granting coaching privileges to Coach Aranda, to perform unsupervised/unchaperoned coaching and supervision of USTA athletes;

f.  Creating a culture of secrecy and deceit in the coaching staff to harbor and conceal known acts and propensities of other coaches that harass and abuse USTA athletes.

50.   Defendants, as the employer/principal responsible for the actions of its employees/agents, including but not limited to Coach Aranda, Defendants' negligent hiring, retention, and supervision of its coaches caused Plaintiff bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, prejudgment interest, punitive damages, attorneys' fees, costs of this action, and such other relief as this Court deems just and proper.

## COUNT II: BATTERY

51.     The Plaintiff re-alleges and incorporates by reference herein all allegations contained in paragraphs 1-35.

52.     The actions of Defendants acting by and through its employee/agents, including, but not limited to, Coach Aranda, who inappropriately touched the Plaintiff, constitute an intentional and offensive touching of Plaintiff to which Plaintiff did not consent.

53.     As a direct and proximate result of the intentional acts of Defendants acting by and through its employee/agents, including, but not limited to, Coach Aranda, the Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

54.     Defendants are directly liable to Plaintiff for the intentional acts of its employees/agents, including but not limited to Coach Aranda, because Defendants possessed a non-delegable, contractual duty to provide coaching services in an environment free from abuse and misconduct, including the battery committed against Plaintiff by Coach Aranda.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, prejudgment interest, punitive damages, attorneys'

fees, costs of this action, and such other relief as this Court deems just and proper.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

55.    The Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1-35.

56.    Defendants' own conduct and conduct by and through its employee/agents, including, but not limited to, Coach Aranda, who sexually assaulted and battered the Plaintiff, was deliberate or reckless infliction of mental suffering.

57.    The sexual assault and battery were outrageous conduct.

58.    The conduct caused Plaintiff emotional distress, which distress was severe. Defendants conduct and actions in acting by and through its employee/agents, including, but not limited to, Coach Aranda, was the direct and proximate cause of severe emotional distress to Plaintiff.

59.    As a direct and proximate result of the intentional acts of Defendants acting by and through its employee/agents, including, but not limited to, Coach Aranda, the Plaintiff suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

60.     Defendants are directly liable to Plaintiff for the intentional acts of its employees/agents, including but not limited to Coach Aranda, because Defendants possessed a non-delegable, contractual duty to provide coaching services in an environment free from abuse and misconduct.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, prejudgment interest, punitive damages, attorneys' fees, costs of this action, and such other relief as this Court deems just and proper.

## COUNT IV: NEGLIGENCE

61.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-35 above.

62.     Defendants breached their non-delegable duty of care owed to Plaintiff, and were negligent in the following ways:

a.  Failing to protect Plaintiff from sexual harassment and assault by their national coaches;

b.  Failing to employ or retain suitable national coaches to whom it entrusted the care of their young, female athletes;

c.  Failing to institute and enforce appropriate policies, procedures, rules, regulations, and requirements necessary to prevent inappropriate sexual conduct directed to their female athletes by their national coaches;

d.  Failing to investigate complaints of sexual assault and harassment against their national coaches;

e.  Failing to notify their athletes of coaches that have engaged in inappropriate sexual conduct with USTA athletes or personnel;

f.  Failing to appropriately discipline Coaches, including Coach Aranda after he sexually assaulted their employee;

g.  Failing to notify Plaintiff of Coach Aranda's history of inappropriate sexual misconduct;

h.  Failing to detect the Coaches' inappropriate behavior towards Plaintiff;

i.  Failing to exercise control over Coaches, including Coach Aranda, and/or to intervene on Plaintiff's behalf;

j.  Failing to implement and/or enforce proper policies and procedures for the protection of their female athletes thereby fostering a culture of inappropriate coach-athlete relationships.

k.  Failing to intervene to prevent the escalation of inappropriate conduct towards Plaintiff by Coaches.

l.  Failing to establish reasonable criteria for the granting of, withdrawal, or reduction of coaching assignments;

m. Failing to exercise reasonable care to ensure that the duty of accountability of USTA coaches toward the athletes entrusted in their care is discharged;

n.  Failing to exercise reasonable care to detect when actions or behavior of a coach are detrimental to athletes' wellbeing or their general safety;

o.  Failing to exercise reasonable care to detect that actions or behavior of a coaching staff member demonstrate noncompliance with USTA Bylaws, Rules and Regulations or Policies and Procedures, and State Law;

p.  Failing to exercise reasonable care to detect that actions or behavior of a coaching staff member, including Coach Aranda, are unprofessional, unethical, or illegal;

q.  Failing to exercise appropriate and reasonable care in appointing and/or reappointing Coaches Aranda as a member of the USTA coaching staff;

r.  Failing to exercise appropriate and reasonable care in granting coaching privileges to Coaches to perform unsupervised/unchaperoned coaching and non-coaching activities to athletes including  Plaintiff.

63.     As a direct and proximate result of the foregoing negligence of the Defendants, Plaintiff was sexually harassed and sexually assaulted by Coach Aranda, causing her bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, prejudgment interest, punitive damages, attorneys' fees, costs of this action, and such other relief as this Court deems just and proper.

## COUNT V:  RESPONDEAT SUPERIOR

64.     The Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 35.

65.     At all times relevant hereto, Plaintiff's USTA coaches were acting in the course and scope of their employment/agency with Defendants and breached the appropriate standards of conduct which was a proximate cause of physical injury and other damages to Plaintiff.

66.     Coach Aranda took advantage of his position as a USTA Coach to sexually assault and batter USTA female athletes including the Plaintiff.

67.     Coach Aranda committed sexual assault and battery against Plaintiff while he was acting as a USTA coach, under the guise of coaching tennis, and in furtherance of Defendants' interests.

68.     Coach Aranda's acts of sexual assault and battery against Plaintiff and other USTA athletes were regularly committed at USTA facilities under the control of Defendants.

69.     As the employer/principal for Coach Aranda, Defendants are vicariously liable for the actions of Coach Aranda within the course and scope of his employment/agency.

70.     As the employer/principal for other USTA coach(es) that were aware of the prior and ongoing sexual abuse by Coach Aranda, USTGA is vicariously liable for the actions of these coach(es) and their failure to inform Plaintiff and the USTA

of the prior abuse by Coach Aranda within the course and scope of his employment/agency.

71.     As the employer/principal responsible for the actions of its employees/agents including but not limited to Coach Aranda, Defendants caused Plaintiff bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

<u>**COUNT VI:  PUNITIVE DAMAGES**</u>

72.     Plaintiff incorporates by reference the allegations made in paragraphs 1-71 above.

73.     The above-described acts by Coach Aranda were the direct and proximate result of the reckless, willful, and gross negligence of the Defendants, in the following particulars:

a.      "Intentional misconduct":  the Defendants had actual knowledge of the wrongfulness of the conduct by Coach Aranda and the high probability that injury or damage to the Plaintiff would result and, despite that knowledge, intentionally enabled, condoned and permitted that course of conduct, resulting in injury or damage to Plaintiff;

b. "Gross Negligence": the Defendants' conduct in allowing the escalation of inappropriate conduct of Coach Aranda towards Plaintiff and by employing but yet failing to properly supervise Coach Aranda despite his known history of sexual predation, was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, who was exposed to such conduct by Coach Aranda.

74. Accordingly, the Defendants' conduct constitutes gross negligence within the meaning of § 768.72(2)(b), Florida Statutes.

75. Defendants are liable for punitive damages for the conduct of Coach Aranda pursuant to § 768.72(3)(b)(c), Florida Statutes, because his conduct was intentional misconduct or gross negligence Defendants engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant.

(a) The officers, directors, or managers of Defendants knowingly condoned, ratified, or consented to such conduct by Coach Aranda.

76. Defendants' aforementioned conduct constituted gross negligence and contributed to the loss, damages, or injury suffered by the claimant.

77. As a direct and proximate result of the foregoing negligence of the Defendants, Plaintiff was sexually harassed and assaulted by Coach Aranda, causing her bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss

of ability to earn money, and aggravation of a previously existing condition.  The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, prejudgment interest, punitive damages, attorneys' fees, costs of this action, and such other relief as this Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury and all issues so triable as a matter of right.

Dated: June 21, 2022                    Respectfully submitted,

*/s/ Ed Normand*
**NORMAND PLLC**
Edmund A. Normand
Florida Bar No. 865590
ed@ednormand.com
Amy Judkins
Florida Bar No. 125046
amy.judkins@normandpllc.com
3165 McCrory Place, Ste. 175
Orlando, FL 32803
Tel: (407) 603-6031

Robert Allard (*pro hac vice* to be filed)
rallard@cmalaw.net
Mark J. Boskovich (*pro hac vice* to be filed)
mboskovich@cmalaw.net
**Corsiglia, McMahon & Allard**
96 North Third Street, Suite 620
San Jose, California 95112
Tel:  (408) 289-1417
Fax: (408) 289-8127

*Attorneys for Plaintiff K.M.*