## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**KYLIE MCKENZIE,**

           **Plaintiff,**

**v.**                                  **Case No: 6:22-cv-615-PGB-LHP**

**UNITED STATES TENNIS ASSOCIATION INCORPORATED and USTA PLAYER DEVELOPMENT INCORPORATED,**

           **Defendants.**

_____/

## ORDER

      This cause comes before the Court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint or, in the alternative, Motion to Strike Certain Allegations (Doc. 36 (the "**Motion**")) and Plaintiff's response in opposition (Doc. 37 (the "**Response**")). Upon consideration, the Motion is due to be granted in part and denied in part.

## I.    BACKGROUND[1]

      This dispute arises from allegedly inappropriate sexual encounters between Plaintiff Kylie McKenzie ("**Plaintiff**") and an employee of Defendants, United States Tennis Association Incorporated ("**USTA**") and USTA Player Development

---

[1] This account of the facts comes from Plaintiff's Second Amended Complaint (Doc. 34), which the Court accepts as true for the purposes of this Motion. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

Incorporated ("**USTA PD**") (collectively, the "**Defendants**"). (*See generally* Doc. 34).

USTA is the National Governing Body ("**NGB**") for the sport of tennis, and USTA PD is an affiliate of USTA that strives to educate and train young players in the game. (*Id.* ¶¶ 6, 8).[2] Together, Defendants work to advance young tennis players' careers by offering training programs at their various National Training Center locations throughout the country, including in Orlando, Florida. (*Id.* ¶¶ 8–9).

Following pervasive sexual abuse allegations plaguing the professional sports arena, the United States Olympic Committee ("**USOC**") notified NGBs, including the USTA, of the need to strengthen protective measures for young athletes. (*Id.* ¶ 10). In response—and upon significant pressure—the USTA implemented its Safe Play program ("**Safe Play**"). (*Id.* ¶ 13). The program's policies indicate a commitment towards "creating a safe and positive environment for every athlete's development in an environment free of misconduct." (*Id.*).[3] However, the USTA resisted implementing many of the USOC's recommended changes, including a prohibition on coaches engaging in romantic relationships with their athletes. (*Id.* ¶¶ 11–15).

---

[2]   As the sole member of USTA PD, USTA elects the directors of USTA PD according to the respective organization's bylaws. (Doc. 34, ¶ 8).

[3]   Safe Play required all USTA employees, including the staff working at National Training Centers, to pass a criminal background check every two years. (*Id.* ¶ 14).

Plaintiff began playing tennis at three years old. (*Id.* ¶ 18). Over the years, Plaintiff trained at a number of National Training Centers, with various different USTA coaches. (*Id.* ¶¶ 18–30). By the age of nineteen, Plaintiff had moved to Florida to train at Defendants' location in Orlando, known as the USTA National Campus. (*Id.* ¶ 24). While there, Plaintiff started to train with USTA national coach Anibal Aranda ("**Coach Aranda**"). (*Id.*). Coach Aranda had been an employee of Defendants for roughly seven years. (*Id.*).

Not long after Coach Aranda and Plaintiff began training together, Coach Aranda's behavior took an unprofessional turn. (*See, e.g.*, *id.* ¶¶ 25–26, 29). Coach Aranda inquired into Plaintiff's personal life, complimented her, and remarked on her appearance. (*Id.*). At one point, Coach Aranda stuck his hands under Plaintiff's shirt, grabbed her stomach and waist, and rubbed it while exclaiming "see, you're too skinny." (*Id.* ¶ 26).

As time went on, Coach Aranda's inappropriate conduct escalated. (*Id.* ¶ 27). For instance, Coach Aranda would sit directly next to Plaintiff on the beach, lean his head on her upper thighs, and rub them before getting up. (*Id.*). In late October of 2018, he acted under the guise of helping Plaintiff with her serving technique in order to intensify physical contact. (*Id.* ¶ 28). He would stand close behind Plaintiff "so that his full body was pressed up against her back and butt." (*Id.*). Then, he would grab her hips and move his fingers lower and lower, pressing harder and harder, down her groin and underwear line with each repetition. (*Id.*). On another occasion, Coach Aranda knelt in front of Plaintiff as she was preparing to serve,

held her hips, and proceeded to look directly at Plaintiff's vaginal area. (*Id.*). He would also routinely slide his hands from Plaintiff's back down to her butt as he "trained" her. (*Id.*).

The most invasive physical interaction transpired on November 9, 2018. (*Id.* ¶ 29). Coach Aranda sat next to Plaintiff after practice, probing her as to whether she thought she was beautiful. (*Id.*). At the time, Plaintiff had a towel over her lap, and Coach Aranda's hand was resting on her thigh. (*Id.*). Following various questions concerning Plaintiff's body, "Coach Aranda slid his hand under her towel and started rubbing her vagina with his fingers." (*Id.*). Fearful and in shock, Plaintiff pushed him away, but Coach Aranda quickly grabbed her calves and knees in an aggressive attempt to massage them. (*Id.*). He then asked Plaintiff "what she wanted him to be," to which Plaintiff responded, only "to be her tennis coach." (*Id.*). As the training session progressed that day, Coach Aranda purported to have the power to get Plaintiff sponsors and transform Plaintiff's career. (*Id.*).

The next day, Plaintiff reported Coach Aranda's sexual misconduct to Defendants. (*Id.* ¶ 30). Subsequently, the United States Center for SafeSport ("**SafeSport**") undertook an investigation. (*Id.*). Summarily, the investigation confirmed Coach Aranda's behavior was reprehensible. (*Id.*).[4] Moreover, it

---

[4] As discussed *infra*, it is possible that findings derived directly from SafeSport's investigative report will ultimately be deemed confidential pursuant to 36 U.S.C. § 220541(f)(4)(C)(i). However, considering the procedural posture, this Court will accept the respective allegations as true for purposes of a motion to dismiss, just as it routinely does other allegations—like hearsay, for example—that eventually will be barred as evidence. Not to mention, the Court is not blind to the fact that the underlying information could easily be uncovered—and ultimately admitted into evidence—irrespective of SafeSport's perplexingly secretive reports.

revealed he had a history of engaging in inappropriate behavior with a female employee ("**Jane Doe**") in Defendants' organizations. (*Id.* ¶ 31). The previous impropriety occurred in 2015 when a group of Defendants' employees were in New York for the U.S. Open and went out one night for dinner and dancing. (*Id.*). At the club, Coach Aranda danced behind Jane Doe, "grinding up on her" and "rubbing her vagina on the outside of her clothes." (*Id.*). Jane Doe tried to leave, but Coach Aranda followed her outside and attempted to get into a cab with her. (*Id.*). Jane Doe never reported the incident and took no measures to prevent history from repeating itself. (*Id.*). Nevertheless, Jane Doe later became Defendants' Senior Manager of Player Development, Events, and Programming at the USTA National Campus, working alongside Coach Aranda and Plaintiff. (*Id.*). Ultimately, the investigation resulted in Coach Aranda's termination. (*Id.* ¶ 32).

Plaintiff filed the operative Second Amended Complaint,[5] asserting six causes of action: Negligent Supervision and Retention (Count I), Battery (Count II), Intentional Infliction of Emotional Distress (Count III), Negligence (Count IV), Respondeat Superior (Count V), and Punitive Damages (Count VI). (*See generally*

---

Nonetheless, the Court need not delineate the precise findings of SafeSport's investigation to support the Court's conclusion.

[5] Plaintiff initiated this lawsuit on March 28, 2022. (Doc. 1). Then, in response to Defendants' first Motion to Dismiss (Doc. 22), Plaintiff filed an Amended Complaint (Doc. 24) pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). Subsequently, Defendants filed a Motion to Dismiss the Amended Complaint. (Doc. 26). However, the Court *sua sponte* dismissed the Amended Complaint as a shotgun pleading with regards to Count I. (Doc. 33). Upon revision, Plaintiff filed the instant Second Amended Complaint, remediating issues in the prior pleading. (Doc. 34).

*id.*). Defendants moved to dismiss the Second Amended Complaint (Doc. 36), and Plaintiff responded in opposition (Doc. 37). The matter is now ripe for review.

## II.   STANDARDS OF REVIEW

### A.   Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," and the court is "not bound to accept as true a legal conclusion

couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

### B.    Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts have broad discretion in ruling on motions to strike. *Anchor Hocking Corp. v. Jacksonville Elec. Auth.*, 419 F. Supp. 992, 1000 (M.D. Fla. 1976); *see* FED. R. CIV. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Hutchings v. Fed. Ins.*, No. 08-cv-305, 2008 WL 4186994, at *2 (M.D. Fla. Sept. 8, 2008) (internal quotations omitted).

## III.   DISCUSSION

### A.    Motion to Dismiss

Defendants now move to dismiss each cause of action. (Doc. 36). The Court will address their arguments in turn.

#### 1.    *Count I: Negligent Retention and Supervision*

"Negligent retention and supervision occur[] when, during the course of employment, the employer becomes aware, or should have become aware, of

problems with an employee that indicates his [or her] unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment." *Pineda v. PRC, LLC*, No. 11-CV-20894, 2011 WL 3022564, at \*2 (S.D. Fla. July 22, 2011) (quoting *Grice v. Air Prods. & Chem., Inc.*, No. 3:98CV205/RV, 2000 WL 353010, at \*15 (N.D. Fla. Feb. 17, 2000)); *see Garcia v. Duffy*, 492 So. 2d 435, 438 (Fla. 2d DCA 1986).[6] To state a cause of action for negligent supervision or negligent retention,[7] claimants must assert the following: (1) the existence of a relationship that gives rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) proximate causation of injury by virtue of the breach.[8] *Albra v. City of Fort Lauderdale*, 232 F. App'x 885, 888 (11th Cir. 2007).[9]

---

[6] Additionally, to allege such claims, "the underlying wrong must be a common law tort." *Jenks v. Naples Cmty. Hosp., Inc.*, 829 F. Supp. 2d 1235, 1257 (M.D. Fla. 2011); *Gutman v. Quest Diagnostics Clinical Lab'ys, Inc.*, 707 F. Supp. 2d 1327, 1330 (S.D. Fla. 2010). The tort that the Court finds has been sufficiently alleged is battery. *See infra* pp. 11–15.

[7] Count I technically commingles two separately cognizable causes of action under Florida law: negligent supervision and negligent retention. *See, e.g.*, *Latson v. Hartford Ins.*, No. 605CV1435ORL19KRS, 2006 WL 485097, at \*4 (M.D. Fla. Feb. 28, 2006). However, considering each claim requires proof of similar elements, courts routinely consider them in tandem. *See Grimm v. City of Boca Raton*, No. 15-80608-CIV, 2015 WL 4483974, at \*8 (S.D. Fla. July 22, 2015) ("In Florida, a negligent supervision claim is analyzed under the same standard as a negligent retention claim[].")); *see also Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1262 n.4 (S.D. Fla. 2015) ("The terms 'negligent supervision' and 'negligent retention' are essentially interchangeable."). Thus, the Court agrees with Plaintiff that pleading both respective causes of action in Count I does not render this a shotgun pleading.

[8] Plaintiff easily satisfies the first element by indicating Coach Aranda was Defendants' employee and addressing the relationship between Defendants' organizations. (Doc. 34, ¶¶ 8–9, 24, 35). Additionally, the third element is met because Plaintiff alleges she suffered trauma as a result of Coach Aranda's inappropriate conduct. (*Id.* ¶¶ 25–29, 50). Therefore, the Court will limit its discussion to the dispositive element. (Doc. 37, pp. 3–4).

[9] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

The sole point of contention surrounds the second element. In order to demonstrate facts sufficient to allege a plausible breach of the duty to exercise reasonable care in retaining or supervising employees, a plaintiff must set forth factual allegations that suggest "the employer was put on notice of the harmful propensities of the employee." *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002); *see Witover v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139, 1148 (S.D. Fla. 2016).

Defendants aver they had no knowledge, prior to being informed of the incidents involving Plaintiff, that Coach Aranda had a propensity to engage in inappropriate conduct. (Doc. 36, pp. 6—7). Accordingly, Defendants argue they could not have acted negligently in failing to pursue investigatory or disciplinary action against an employee who raised no previous suspicion. (*Id.* at p. 11).[10] Plaintiff, however, highlights the gaping hole in this contention—the subject incident uncovered by the investigation directly involved Defendants' *Senior Manager of Player Development, Events, and Programming*. (Doc. 37, pp. 6—

---

[10] Defendants primarily rely on *Doe v. ATC, Inc.*, 624 S.E.2d 447 (S.C. Ct. App. 2005). However, such reliance is misguided. The aforementioned case is markedly different than the case at bar upon consideration of the difference in procedural posture alone. In *ATC*, the court was considering an appeal from the granting of a directed verdict on an explicitly "narrow" issue—whether or not a jury question was presented over an employer's decision to retain an employee who had been subject to a single report of inappropriate sexual conduct. *Id.* at 448, 450. Accordingly, the court's conclusion was informed by weighing the evidence and evaluating the record. *See generally id.* In the instant case, however, there is no evidence and consequently, no record. At this point in time, the case is merely being scrutinized according to a far less demanding plausibility standard. Thus, the procedurally inapposite nature of *ATC* renders the comparison unpersuasive. Nonetheless, the *ATC* court even concluded with a concession that although the outcome differed in the respective case before it, "a single assault may well create a jury question as to whether an employee should be fired." *Id.* at 452. Therefore, the Court declines to place any weight on the proposed comparison at the current stage in the proceedings. (*See* Doc. 36, pp. 9–11).

7).[11] Consequently, under the theory of agency, Defendants' knowledge is implicit via imputation. (*See id.*). The Court agrees with Plaintiff's reasoning.

Under Florida law and the RESTATEMENT (THIRD) OF AGENCY § 5.03, it is axiomatic that "knowledge an agent or employee acquires within the scope of her authority generally may be imputed to her principal or employer." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017); *accord Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors . . . is imputed to the corporation."); *Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675, 685 (11th Cir. 2018). More specifically, when an agent is on notice—or has reason to know—of a fact material to the agent's duties to the principal, knowledge of that fact is imputed to the principal. *Dye*, 908 F.3d at 685–86 (quoting RESTATEMENT (THIRD) OF AGENCY § 5.03) (quotation omitted).

Here, SafeSport's investigation revealed Coach Aranda had engaged in prior unsolicited misconduct with another one of Defendants' employees, Jane Doe. (Doc. 34, ¶¶ 30–31). This individual eventually became a senior level manager for Defendants. (*Id.* ¶ 31). Thus, at this stage in the proceedings, it is more than plausible to infer Jane Doe's knowledge of Coach Aranda's inappropriate sexual proclivities is imputable to Defendants. Jane Doe held a managerial position that purported to promote player development—working alongside Plaintiff and Coach

---

[11]   The Court notes that it need not rely solely on Plaintiff's generalized allegations of misconduct permeating the tennis world in order to reach its conclusion, at this procedural juncture, that Defendants were plausibly put on notice of Coach Aranda's propensities.

Aranda, nonetheless. (*See id.*). At all material times, Jane Doe undisputedly knew of her *own* similarly inappropriate experiences with Coach Aranda in which he had attempted unwanted sexual advances against her. Construing the aforementioned allegations in the light most favorable to Plaintiff, the Court assumes such knowledge would have been of substantial significance and/or relevance to someone in Jane Doe's position. Thus, the Court finds it plausible that Jane Doe's direct and personal knowledge of Coach Aranda's tendencies plausibly equates to Defendants' knowledge as well.[12] Therefore, Defendants' argument that they had no notice as to any of Coach Aranda's prior misconduct is premature considering the procedural posture. Consequently, Plaintiff has successfully pled a plausible claim for both negligent retention and supervision.

### 2. *Count II: Battery*

Plaintiff also seeks to hold Defendants vicariously liable for the acts of Coach Aranda under the doctrine of *respondeat superior*. (Doc. 37, pp. 9–14; *see* Doc. 34).[13] To the contrary, Defendants aver that Coach Aranda was neither engaging in behavior he was employed to perform nor acting for Defendants' benefit when he committed the alleged battery. (Doc. 36, pp. 12–14). Thus, Defendants argue they

---

[12] The Court acknowledges Jane Doe may very well have had her own reasons for withholding such a personally violative experience. However, considering related precedent and her position within Defendants' organizations, the Court must consider her awareness of Coach Aranda's predispositions and subsequent failure to act at this stage in the proceedings.

[13] Plaintiff opines that Defendants are liable for the tortious acts of Coach Aranda under two theories, a nondelegable duty and vicarious liability. (Doc. 37, pp. 9–13). Considering Plaintiff has plausibly pled a claim against Defendants for vicarious liability of a battery (*see id.* at pp. 11–13), the Court declines to address the alternative theory.

cannot be vicariously liable for conduct Coach Aranda committed outside the scope of his employment. (*Id.*).[14] The Court, however, disagrees with Defendants' conclusion.[15]

Under the doctrine of *respondeat superior*, an employer can be held vicariously liable for their employees' acts so long as such acts are committed within the scope of their employment and "to further a purpose or interest, however excessive or misguided, of the employer." *Doe v. St. John's Episcopal Par. Day Sch., Inc.*, 997 F. Supp. 2d 1279, 1287 (M.D. Fla. 2014) (citing *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356 (Fla. 3d DCA 2001)). An employee's conduct is within the scope of employment if "(1) the conduct is of the kind he was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed,[16] and

---

[14]   To plead a cause of action for battery in Florida, a plaintiff must demonstrate that "the defendant acted with the intent to cause a harmful or offensive contact with [plaintiff] and such contact occurred." *Ainsworth v. Norris*, 469 F. App'x 775, 777 (11th Cir. 2012). Neither party seems to dispute the existence of the elements of the underlying battery committed by Coach Aranda. Instead, the parties' arguments center on whether or not Defendants—Coach Aranda's employers—may be held vicariously liable for such a battery. (*See* Doc. 36, pp. 12–14; Doc. 37, pp. 9–14). Thus, the Court will not analyze in detail plausibility of the actual battery claim as it is quite obvious that, accepting the allegations as true, one has been sufficiently pled.

[15]   The Court acknowledges Defendants' application of *Feagin v. Chinn*, No. 16-CV-24346, 2017 WL 384244 (S.D. Fla. Jan. 12, 2017), to support their argument that Coach Aranda was not employed to perform the misconduct he engaged in and did not commit battery for Defendants' benefit. (Doc. 36, pp. 12–14). However, the Court finds *Feagin* as a rare exception to the usual outcome of parallel cases. Regardless, the Court distinguishes the similarity of *Feagin*. Both *Feagin* and the case at bar involve unwanted sexual advances of a coach. *See* 2017 WL 384244, at *1–4; (Doc. 34). Yet, the Court finds a predominant difference in the more entangled way in which Coach Aranda allegedly abused his very position to further his physical advances.

[16]   This element is justly undisputed. (*See* Doc. 36, p. 12). All of the alleged instances involving Plaintiff and Coach Aranda occurred at Defendants' property, on the tennis courts, during

(3) the conduct is activated at least in part by a purpose to serve the master." *Id.* at 1287–88.

In general, "sexual assaults and batteries by employees are held to be outside the scope of an employee's employment and, therefore, insufficient to impose vicarious liability on the employer." *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985); *see, e.g.*, *St. John's*, 997 F. Supp. at 1288. However, "Florida recognizes an exception to the general rule if the employee/tortfeasor accomplished the tort by virtue of the employer/employee relationship." *U.S. Equal Emp. Opportunity Comm'n v. Favorite Farms, Inc.*, No. 17-CV-1292-T-30AAS, 2018 WL 295549, at *2 (M.D. Fla. Jan. 4, 2018); *see Nazareth*, 467 So. 2d at 1078; *Goss v. Hum. Servs. Assocs., Inc.*, 79 So. 3d 127, 132 (Fla. 5th DCA 2012) ("An exception exists when the employee purported to act on behalf of the employer or when the employee was aided by the agency relationship.").

Plaintiff's allegations clearly satisfy the aforementioned exception at this point in the litigation. Instructive situations have been presented in Florida courts as well as courts within the Eleventh Circuit. For example, in *Favorite Farms*, the plaintiff was pushed into a bedroom and raped by one of defendant's employees—a supervisor whose job entailed assigning housing to employees like plaintiff. 2018 WL 295549, at *1–2. The court found plaintiff had adequately pled defendant's

---

practice sessions. (Doc. 34, ¶¶ 23–29). Thus, the Court will tailor its discussion to the first and third elements.

employee utilized his position of authority, enabled by virtue of the employee-employer relationship with defendant, to commit the intentional tort. *Id.*

Similarly, in *St. John's*, the plaintiff was sexually and physically abused by priests and teachers of defendant's church. 997 F. Supp. at 1282–83. In that case, the plaintiff alleged the priests "abused [p]laintiff on [defendant's] property, utilized their positions of authority to manipulate and intimidate [p]laintiff, . . . had access to and the opportunity to abuse [p]laintiff because of their official positions and duties," and utilized their employment roles to abuse plaintiff. *Id.* at 1288–89 (specifying that "[defendant's employee] abused [p]laintiff while giving him piano lessons as part of his education and while on Church choir trips"). Ultimately, the court concluded the aforementioned allegations satisfied the Florida exception to impose vicarious liability, and the claim survived a motion to dismiss. *Id.*

Considering the above-stated precedent, Plaintiff has also sufficiently pled Coach Aranda's conduct occurred within the scope of his employment. On one occasion, the Complaint explicitly alleges that Coach Aranda initiated such inappropriate sexual contact "under the guise he was helping her with her serving technique." (Doc. 34, ¶¶ 28, 67). Plaintiff delineates that Coach Aranda tightly gripped her groin and pressed against her as she "practiced the serve loading motion." (*Id.* ¶¶ 28–29). In another instance, Coach Aranda "slid his hand under [Plaintiff's] towel and started rubbing her vagina with his fingers." (*Id.*). Although Plaintiff was visibly uncomfortable, Coach Aranda continued to capitalize on his

coaching position, insinuating he could elevate Plaintiff's career if she continued to train with him. (*See id.*). Thus, the Court is at liberty to plausibly infer that Coach Aranda's behavior was directly aided by virtue of his employment, irrespective of the measures Defendants supposedly instituted to express "condemnation of [such] misconduct." (Doc. 36, p. 14). In fact, viewing allegations in the light most favorable to Plaintiff, the sexual advances occurred inextricably with Coach Aranda's job.

In any event, vicarious liability is a fact-intensive inquiry more appropriately addressed at summary judgment or by a jury. *E.g.*, *Favorite Farms*, 2018 WL 295549, at *2; *DK v. Sch. Bd. of Manatee Cnty.*, No. 14-CV-2329-T-33TBM, 2014 WL 5473578, at *2 (M.D. Fla. Oct. 28, 2014). Thus, at the current stage in the litigation, the Court finds Plaintiff's allegations sufficient to render it plausible that Defendants may be held vicariously liable for Coach Aranda's behavior. Accordingly, Plaintiff's states a sufficient claim for battery.

### 3.   *Count III: Intentional Infliction of Emotional Distress*

With regards to Count III, Defendants argue that dismissal is warranted because Plaintiff's claim for intentional infliction of emotional distress relies on acts committed by Coach Aranda outside the scope of his employment.[17] (Doc. 36, pp. 14–16). Thus, as Defendants opined with respect to Count II, Defendants cannot be vicariously liable for Coach Aranda's conduct. (*Id.*). However, for the

---

[17]   Accordingly, none of the actual elements required to plead a claim for intentional infliction of emotional distress are in dispute. Thus, the Court will not address them.

reasons akin to those the Court set forth in its analysis of Count II, the Court disagrees. Thus, Plaintiff's claim for intentional infliction of emotional distress survives the instant Motion to Dismiss.

### 4.   *Count IV: Negligence*

To satisfy the requisite burden of proof for a negligence claim under Florida law, a plaintiff must establish: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached said duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the breach caused the plaintiff to suffer damages. *See Clay Elec. Coop, Inc. v. Johnson*, 875 So. 2d 1182, 1185 (Fla. 2003).

The crux of the parties' disagreement implicates the duty element of a negligence claim. (*See* Doc. 36, pp. 16–18; Doc. 37, pp. 14–15).[18] "Foreseeability of an injury is a prerequisite to the imposition of a duty upon a defendant. If injury is not reasonably foreseeable, then there can be no recovery." *Firestone Tire & Rubber Co. v. Lippincott*, 383 So. 2d 1181, 1182 (Fla. 5th DCA 1980) (citations omitted). Accordingly, Defendants assert that the purported harm to Plaintiff was

---

[18] To the extent the subsequent element of breach is implicated, "whether a party has breached the applicable duty of care is a question of fact generally reserved for the jury." *Randall v. Target Corp.*, No. 13-61196-CIV, 2014 WL 222340, at *3 (S.D. Fla. Jan. 21, 2014). Accordingly, the Court highlights that the viability of Plaintiff's negligence claim does not center on whether or not Defendants implemented SafePlay's initiative—it hinges on the adequacy of the program itself. (*See* Doc. 36, pp. 16–18). Likewise, Defendants cannot successfully insulate themselves from liability if they simply put into place, and then followed, a perfunctory program.

unforeseeable, and thus, Defendants have no duty to protect Plaintiff from the related acts. (Doc. 36, pp. 16–18).[19] The Court disagrees.

As Plaintiff highlights in her Response, the Second Amended Complaint is replete with various allegations that plausibly support reasonable foreseeability of the alleged harm and in turn, a negligence claim. (*See* Doc. 37, pp. 14–15; *see also* Doc. 34).

For one, Plaintiff explicitly lays out the pervasive "crisis" plaguing the world of sports—coaches molesting minor athletes. (Doc. 34, ¶¶ 10–15). Plaintiff then delineates how the USOC, eventually, pressured Defendants to implement measures that would strengthen the protection of their young athletes. (*Id.*). Nevertheless, Plaintiff alleges USTA admitted it was weary that "implementation of [safety] measures would greatly increase [its] liability exposure." (*Id.* ¶ 11). Consequently, Defendants "resisted implementing many of the USOC's recommended changes," notably refusing to prohibit coaches from engaging in romantic relationships with their athletes—even though it knowingly enabled abuse in the women's game. (*See id.* ¶¶ 10–12). Accordingly, viewed in the light most favorable to Plaintiff, the overarching allegations of rampant sexual

---

[19] The authority Defendants cite to support their argument that they had no duty to protect Plaintiff from the alleged acts is unavailing. *See Hammer v. Lee Mem'l Health Sys.*, No. 18-CV-347-FtM-29MRM, 2018 WL 3707832, at *1, 3 (M.D. Fla. Aug. 3, 2018); (Doc. 36, p. 17). In *Hammer*, a nurse at the defendant's hospital allegedly sexually assaulted the plaintiff while she was a patient. 2018 WL 3707832, at *1. In dismissing plaintiff's negligence-based claims, the court emphasized that the plaintiff demonstrated no facts that defendant "received actual or constructive notice of problems with" the subject employee prior to the incident with plaintiff—rendering plaintiff's purported harm unforeseeable. *Id.* at *2–3. Simply put, that is not the case here.

misconduct—specifically, professional coaches taking advantage of vulnerable athletes—render it plausible that Coach Aranda's acts were foreseeable.

Irrespective of the aforementioned, and as the Court addressed extensively in its discussion of Counts I and II, Plaintiff also set forth revelations of Jane Doe's prior inappropriate sexual encounter with Coach Aranda. (*Id.* ¶ 31). By virtue of Jane Doe's senior level management position in Defendants' organizations, it is plausible that Defendants would be charged with having been on notice of their employee's proclivities, rendering future similar acts, as those alleged in the case at bar, foreseeable. (*Id.*). Consequently, Plaintiff has sufficiently pled a negligence claim.

### 5. *Count V: Respondeat Superior*

Defendants further move to dismiss Plaintiff's respondeat superior claim. (Doc. 36, p. 18–19). Defendants argue the doctrine of respondeat theory is not an independent cause of action but a theory of liability. (*Id.*). The Court agrees.

The issue presented is quite straightforward. Florida does not recognize respondeat superior as an independent cause of action itself, only as a doctrine of liability. *E.g., Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-60046-CIV, 2006 WL 8431505, at *12 (S.D. Fla. Jan. 20, 2006); *Trump v. Clinton*, No. 22-CV-14102, 2022 WL 4119433, at *30 (S.D. Fla. Sept. 8, 2022); *see Turner Murphy Co. v.*

*Specialty Constructors, Inc.*, 659 So. 2d 1242, 1245 (Fla. 1st DCA 1995). Thus, the Court must dismiss Count V accordingly.[20]

### 6. *Count VI: Punitive Damages*

Lastly, Defendants move to dismiss Plaintiff's claim for punitive damages under § 768.72(3) of the Florida Statutes. (Doc. 36, pp. 19–20). Defendants argue they were unaware of Coach Aranda's conduct until Plaintiff reported it, and Defendants then fired him. (*Id.*). Thus, Defendants could not have possibly ratified or consented to his conduct, nor acted grossly negligent with respect to the situation. (*Id.*). Alas, the Court disagrees.

Under § 768.72(3), "punitive damages may be imposed for the conduct of an employee or agent" if the employer, principal, corporation, or other legal entity: 1) "knowingly participated in such conduct," 2) "knowingly condoned, ratified, or consented to such conduct," or 3) "engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant." FLA. STAT. § 768.72(3). The statute defines "gross negligence" as conduct that "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* § 768.72(2)(b).

---

[20] The Court notes, however, that such a dismissal is purely technical. In fact, the Court found *supra* that the theory of respondeat superior has been plausibly pled in accordance with other claims Plaintiff has set forth. Thus, Plaintiff is in no way precluded from arguing that this *theory* applies throughout the present case; Defendants are clearly on notice. *See Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*, No. 19-CV-2527-T-33CPT, 2020 WL 5628734, at *2–3 (M.D. Fla. Sept. 21, 2020); *Colite*, 2006 WL 8431505, at *12 n.25.

The Second Amended Complaint plausibly establishes that Defendants "knowingly condoned, ratified, or consented to [Coach Aranda's] conduct," or, at the very least, acted grossly negligent in contributing to Plaintiff's harm. *See id.* § 768.72(3); (Doc. 34). Plaintiff's allegations of Jane Doe's history with Coach Aranda, coupled with her position in senior management, support the plausible conclusion that Defendants knew of their employee's sexual improprieties and yet, continued to employ him in a position of power regardless. (*See* Doc. 37, pp. 17–18). Moreover, Defendants allegedly resisted the recommended implementation of related safety measures. (*See id.*).

Thus, taking the aforementioned as true, the Court can reasonably infer that such allegations equate to Defendants knowingly condoning, ratifying, or consenting to the subject conduct. In any event, Plaintiff has sufficiently alleged that Defendants, at a minimum, acted with reckless disregard in failing to put adequate protective measures in place for athletes and not taking preventive action following Jane Doe's initial incident with Coach Aranda. (*See generally* Doc. 34). In turn, Defendants plausibly engaged in grossly negligent conduct that contributed to the harm alleged herein. *See* FLA. STAT. § 768.72(3). Accordingly, Plaintiff states a plausible claim for punitive damages.

### B.   Motion to Strike

While outright dismissal may be inappropriate, striking individual allegations can still be warranted. Here, Defendants move to strike 1) references in the Second Amended Complaint to SafeSport's investigations, and 2) terms such

as "sexual assault" and "sexual battery." (Doc. 36, pp. 21–23). However, for the forthcoming reasons, the Court finds that no allegations necessitate striking.

### 1. Information from SafeSport's Investigative Report

In Paragraphs 30 and 31 of the Second Amended Complaint, Plaintiff details the results of SafeSport's investigation. (*See generally* Doc. 34, ¶¶ 30–31). Defendants argue that such information "is confidential as a matter of federal law" and thus, "allegations quoting or otherwise referencing" SafeSport's investigation must be struck. (Doc. 36, pp. 21–22). Ultimately, the Court disagrees with Defendants' conclusion.

Defendants' merely purport that the respective allegations associated with SafeSport's investigation "unfairly prejudice[]" Defendants. (*Id.*). As Plaintiff correctly alludes, however, Rule 12(f) does not expressly encompass such a reason. *See* FED. R. CIV. P. 12(f); (Doc. 37, pp. 18–19). Moreover, Defendants cite no supporting case law that considers unfair prejudice as the sole factor in evaluating motions to strike.[21]

In fact, courts within the Eleventh Circuit routinely hold that motions to strike are "drastic" remedies "disfavored by the courts." *See, e.g.*, *Agan v. Katzman & Korr, P.A.*, 328 F. Supp. 2d 1363, 1367 (S.D. Fla. 2004); *Thompson v. Kindred Nursing Ctrs. E., LLC*, 211 F. Supp. 2d 1345, 1348 (M.D. Fla. 2002). Historically,

---

[21] The only case Defendants cite to support their proposition involves striking certain matters contained in a motion for summary judgment—not a motion a dismiss. Such a procedural difference, in this instance, renders the comparison unpersuasive. (Doc. 36, pp. 21–22); *see Equal Emp. Opportunity Comm'n v. Am. Tool & Mold, Inc.*, No. 12-CV-2772-T-35EAJ, 2013 WL 12155446, at *3 (M.D. Fla. Nov. 26, 2013).

the entire "purpose of a motion to strike [has been] to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Schmidt v. Life Ins. Co. of N. Am.*, 289 F.R.D. 357, 358 (M.D. Fla. 2012) (quoting *Hutchings*, 2008 WL 4186994, at *2. "If there is any doubt as to whether under any contingency the matter may raise an issue, [motions to strike] should be denied." *Blake v. Batmasian*, 318 F.R.D. 698, 700 (S.D. Fla. 2017).

Here, it is indisputable that the information derived from SafeSport's Report raises a highly contested issue—one that is in no way immaterial, redundant, or impertinent. In fact, it is integral. Nonetheless, irrespective of the significance of the disputed information, juries are only exposed to admissible evidence. The Court itself is more than equipped to compartmentalize what are mere allegations from facts, supported by evidence, that emerge later in the proceedings. Thus, the Court finds such references do not have an unfairly prejudicial effect at the pleading stage and consequently, do not warrant striking.[22]

### 2.   Terms "Sexual Assault" and "Sexual Battery"

Lastly, Defendants contend that the terms "sexual battery" and "sexual assault" are "impertinent and scandalous" misnomers of the alleged acts committed and thus, must be struck. (Doc. 36, p. 23). The Court is simply not convinced.

---

[22]   The Court notes that this is more of an evidentiary matter and thus raised prematurely.

For one, Defendants cite no supporting case law for this proposition. (*See id.*).[23] Second, contrary to Defendants' argument, sexual assault and sexual battery do not solely imply rape—in reality, the terms encompass a broad spectrum of offensive touching without consent. (*See id.*). Moreover, the Court does not employ definitions from criminal statutes interchangeably in civil suits. Needless to say, terms embody different meanings in different realms.

Nevertheless, "Florida law [routinely] equates sexual battery with [] intentional torts." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 917 (11th Cir. 2004). Thus, labels such as "sexual assault" or "sexual battery" are commonplace in pleading intentional torts of a similar nature to those alleged herein. *See, e.g.*, *Hoke v. Murphy*, No. 21-CV-00128-WS-MAF, 2021 WL 5828675, at *4 (N.D. Fla. Oct. 22, 2021) ("Sexual assault amounts to tortious conduct in Florida."), *report and recommendation adopted*, No. 21CV128-WS/MAF, 2021 WL 5827126 (N.D. Fla. Dec. 8, 2021); *Malicki v. Doe*, 814 So. 2d 347 (Fla. 2002).

Further, the Court emphasizes that the fact the core allegations themselves are inherently "scandalous" does not negate their relevance or admissibility. (*See* Doc. 37, pp. 18–20). If such were the case, the accused would always be insulated, and claims of the like would amount to nothing. Accordingly, the Court will not

---

[23] *See, e.g.*, *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The court] will not do his research for him.").

strike Plaintiff's characterization of the ensuing events merely to cushion their impact.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint or, in the alternative, Motion to Strike Certain Allegations (Doc. 36) is **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Orlando, Florida on April 24, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties