## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**KYLIE MCKENZIE,**

        **Plaintiff,**

**v.**                      **Case No: 6:22-cv-615-PGB-LHP**

**UNITED STATES TENNIS ASSOCIATION INCORPORATED and USTA PLAYER DEVELOPMENT INCORPORATED,**

        **Defendants.**

_____/

### ORDER

This cause is before the Court on Defendants' Motion for Summary Judgment (Doc. 96 ("**Defendants' Motion**")) and Plaintiff's Motion for Partial Summary Judgment (Doc. 98 ("**Plaintiff's Motion**")). Both parties have responded in opposition (Docs. 108, 112) and filed sur-replies (Docs. 125, 126). Upon consideration, Defendants' Motion (Doc. 96) will be denied, and Plaintiff's Motion (Doc. 98) will be granted.

## I.    BACKGROUND

This lawsuit concerns liability for a sexual assault perpetrated against Plaintiff Kylie McKenzie ("**McKenzie**") on November 9, 2018 by a coach whom Defendants United States Tennis Association Incorporated ("**USTA**") and USTA Player Development Incorporated ("**USTA PD**") (collectively, the "**Defendants**")

employed and assigned to train her at their National Campus in Lake Nona, Florida. (Doc. 34). Practice was coming to an end when the coach, Anibal Aranda ("**Coach Aranda**"), sat next to McKenzie on a courtside bench, placed his hand on her thigh, then slid his hand onto her groin and started rubbing her vagina over her clothes—having earlier reserved a secluded court that he knew lacked working cameras and a time when no one else would be around. (Doc. 95-1, 40:22–41:16; Doc. 104-4, pp. 5–13, 80). McKenzie believes Defendants failed to adequately protect her from the assault, while Defendants believe they had no obligation to take greater steps than they did to prevent it. (Docs. 34, 96).

USTA is the National Governing Body ("**NGB**") for the sport of tennis, and USTA PD is its affiliate charged with training young players in the game and managing the training facilities. (Doc. 95-1, ¶¶ 1–3; Doc. 95-7, 12:23–13:2). Membership in USTA is a prerequisite for any player to be eligible to compete in any USTA-sanctioned tournament in the United States or abroad, which requires adherence to the USTA Membership Terms and Conditions. (Doc. 98-3; Doc. 95, ¶ 4). Each member agrees to be governed by "USTA's athlete abuse prevention policies and program, known as Safe Play." (Doc. 95-2). First launched in 2013, USTA's Safe Play program eventually included an acknowledgment that sexual misconduct can occur "where there is a Power Imbalance, regardless of purported Consent," and presumed such a power imbalance exists "[o]nce a coach-Athlete relationship is established." (Doc. 95, ¶ 5; Doc. 95-3, 20:19–24; Doc. 95-5, p. 69).

USTA initially resisted a restriction on sexual relationships between players and coaches, which came at the United States Olympic Committee's ("**USOC**") behest. (Doc. 98-7.) As far back as 2012, the USOC sought to impose on NGBs minimum standards for preventing abuse and place a national body in charge of developing training and investigating claims of sexual misconduct, which USTA opposed. (Doc. 98-5; Doc. 98-6, pp. 6–7). In marking up the USOC's draft minimum standards, USTA said the restriction on romantic relationships "is not realistic in tennis" because "MANY female players date their own or other coaches[.]" (Doc. 98-7, p. 1). But by 2017, USTA had adopted a policy banning those relationships. (Doc. 95-5, p. 69).

That same year, Congress established the United States Center for SafeSport (the "**Center**") by federal statute, which it tasked with jurisdiction over the USOC and each NGB with regard to safeguarding amateur athletes from emotional, physical, and sexual abuse. 36 U.S.C. § 220541(1)(B); (Doc. 95, ¶¶ 7–8). The Center created the SafeSport Code for the U.S. Olympic and Paralympic Movement (the "**SafeSport Code**"). (Doc. 95, ¶¶ 10–11). The 2018 version of the Code requires adults with authority over or frequent contact with athletes to report any sexual misconduct of which they become aware. (Doc. 95, ¶¶ 12–14; Doc. 95-6, p. 2). All USTA employees receive annual training on the SafeSport Code, including policies related to mandatory reporting. (Doc. 95, ¶ 15).

McKenzie trained full-time with the USTA, with a few interruptions, from the ages of twelve to nineteen. (Doc. 98-1, ¶ 13). When she was 12, she accepted a

USTA national coach's invitation to train full-time at the organization's facility in California, where she spent several years away from her family, receiving financial grants from the USTA, before moving back to her home in Arizona. (Doc. 95-11, 196:16–197:10, 207:6–22; Doc. 98-1, ¶¶ 1–2, 4–5; Doc. 98-3, 41:17–44:6, 45:7–46:15). When she was 15, she won first place in the U.S. National Hard Court competition. (Doc. 98-1, ¶ 10). Executives with the USTA saw her play at the competition and approached her about joining the player development program at the USTA training facility in Boca Raton, Florida. (Doc. 95-11, 213:20–214:12). Understanding that the USTA invests in few junior players this way, McKenzie left Arizona to train full-time in Florida—working and traveling with USTA national coaches and at times living in USTA dorms. (Doc. 95-11, 116:2–10, 215:16–20; Doc. 98-1, ¶¶ 11–12). She continued to train there until sustaining a shoulder injury, which she rehabbed at home in Arizona, before picking up training again in August 2018 when the USTA National Campus opened. (Doc. 98-1, ¶ 14).

Coach Aranda came to take over McKenzie's training in October 2018 when the usual coach she trained with, originally assigned to her in 2016, left for about one or two weeks with another player he was coaching. (Doc. 104-4, p. 10). USTA PD first hired Coach Aranda to train players part-time in 2012 before promoting him to full-time coach in 2014—conducting background checks, which were clear. (Doc. 95, ¶¶ 16–18; Doc. 95-8; Doc. 95-9). He was also SafeSport certified. (Doc. 95, ¶¶ 18–19; Doc. 97-7, ¶¶ 6, 12). McKenzie's original coach had started to become increasingly unavailable, leading her to train occasionally with Coach Aranda, who

expressed interest in becoming her full-time coach. (Doc. 104-4, p. 10). McKenzie was excited by the prospect of having a coach to work with consistently and knew Coach Aranda had successfully trained her friend, Cici Bellis, to be a top 50 tennis player in the world. (*Id.*). Coach Aranda discussed making the switch with McKenzie's original coach, which their bosses approved. (*Id.*).

During their first weeks training together, Coach Aranda began making inappropriate comments about McKenzie's body, which escalated to inappropriate contact. (Doc. 104-4, p. 13). He would steadily lean in closer to her while the two reviewed cellphone videos of her performance on a courtside bench until he was pressed up against her, and then pat her thigh. (Doc. 95-11, 137:1–138:13; Doc. 104-4, p. 13). One time, he lifted her shirt and patted her stomach. (Doc. 95-11, 141:11–12). When McKenzie would practice serving, he would place his hand just above her buttocks and then press himself against her back, placing his hands on her hips. (Doc. 95-11, 148:1–5, 156:21–157:3). Coach Aranda also began to schedule practices with McKenzie from 11 a.m. to 1 p.m., after most players had finished their sessions, on the red clay courts in the back of the facility, which received little foot traffic. (Doc. 104-4, p. 11). He would reserve a court where he knew video cameras were not working. (*Id.* at p. 80).

On November 9, 2018, Coach Aranda again sat next to McKenzie on a courtside bench as practice was winding down. (*Id.* at p. 18). McKenzie had a towel over her lap and leggings on underneath. (*Id.*). Coach Aranda started to aggressively question her, asking if she thought she was beautiful and what tennis

star she wanted to look like. (*Id.*). He placed his hand on her thigh and eventually slid it to her groin area, rubbing up and down on her vagina. (*Id.*; Doc. 95-11, 169:10–22). McKenzie pushed him away, but he knelt down in front of her and started rubbing her calves and knees, trying to massage them. (Doc. 104-4, p. 19). He then asked McKenzie "what she wanted him to be," to which she replied, only "to be her tennis coach," which seemed to anger him. (Doc. 95-11, 164:2–7). The two walked to the indoor courts inside the facility to put their tennis balls away, and Coach Aranda started talking about how he could help manage her professional return and get her sponsors. (*Id.* 167:10–25). She then left the facility. (*Id.* 170:1–21).

McKenzie drove to her friend Cici Bellis's house, where she would stay from time to time, and told her what happened. (*Id.*). The two then called Defendants' Manager of Player Development, Events, and Programming, and she relayed the information to her superiors. (*Id.* 174:5–21; Doc. 97-5, 62:20–25). Defendants immediately suspended Coach Aranda's employment and reported his misconduct to the Center. (Doc. 95-14). The Center undertook an investigation, which confirmed Coach Aranda engaged in sexual misconduct with McKenzie. (Doc. 104-4). The investigation also revealed an incident involving Coach Aranda four years prior. (*Id.* at p. 29). During a night out with colleagues in New York before a U.S. Open event, he similarly groped a USTA employee ("**Jane Doe**")—"grinding up" on her on a dance floor and then "rubbing her vagina, on the outside of her clothes." (*Id.* at pp. 13, 29; Doc. 95-16, 10:2–5, 21:9–23:18). Jane Doe pushed him away and

left the nightclub, but Coach Aranda followed her outside and attempted to get into a cab with her. (Doc. 104-4, p. 29). She did not report it, even after receiving a promotion to Manager of Player Development, Events, and Programming. (*Id.*). Ultimately, the investigation resulted in Coach Aranda's termination. (Doc. 95-3, 28:16–22).

In 2022, McKenzie filed this lawsuit alleging Negligent Supervision and Retention (Count I), Battery (Count II), Intentional Infliction of Emotional Distress (Count III), Negligence (Count IV), and Punitive Damages (Count V). (Doc. 34). Defendants now move for summary judgment on all counts arguing they were unaware of any propensity on the part of Coach Aranda for sexual misconduct, which they do not condone, and that they exercised ordinary care. (Doc. 96). McKenzie moves for partial summary judgment on Count IV asking the Court to find as a matter of law that a special relationship imposed on Defendants an affirmative duty of care. (Doc. 98). The parties opposed each other's motions (Docs. 108, 112) and filed sur-replies (Docs. 125, 126). With briefing complete, the matter is ripe.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials" but may also consider any other material in the record. FED. R. CIV. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court may not grant summary judgment if doing so would be based on witness credibility determination; the Court must accept the non-movant's competent testimony as true for purposes of ruling on summary judgment. *Johnson v. Lang*, No. 19-14278, 2022 WL 2734421, at *4 (11th Cir. July 14, 2022) (quoting *Mize v.*

*Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007)[1] ("The district court was correct in observing that it could not consider Edinger's credibility as a witness in ruling upon summary judgment."); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (holding that Rule 56(c) precludes summary judgment when the only way to reconcile conflicting testimony is to "assess the credibility of witnesses").

## III.   DISCUSSION

### A.   Count I - Negligent Retention and Supervision

Florida law recognizes a cause of action for negligent retention and supervision. *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954). Negligent retention or supervision "occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Env't Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005). A plaintiff must show that "once an employer received active or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate or take corrective action." *Garcia*

---

[1]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

*v. Duffy*, 492 So. 2d 435, 441 (Fla. 2d DCA 1986). Liability attaches only if the plaintiff is "within the zone of foreseeable risks created by the employment" and the failure to take reasonable action is the proximate cause of the plaintiff's harm. *Watson v. City of Hialeah*, 552 So. 2d 1146, 1149 (Fla. 3d DCA 1989).

For purposes of negligent retention and supervision, an employer is not considered separately from its managers—since a corporation cannot act on its own and only management can receive notice of employee's unfitness or take corrective action. *See Tallahassee Furniture Co., Inc. v. Harrison*, 583 So. 2d 744, 754 (Fla. 1st DCA 1991) (declining summary judgment based on facts "known to management" and subsequent inaction); *McArthur Jersey Farm Dairy, Inc. v. Burke*, 240 So. 2d 198, 201 (Fla. 4th DCA 1970) (finding dairy farm had notice of employee's reckless driving because dairy superintendent was aware of it and previously told the employee to stop). "The factors constituting notice, employee fitness, and the type of action reasonably required of the employer" are questions of fact that will vary based on the circumstances. *Garcia*, 492 So. 2d at 441. The inquiry for those factors centers, in part, on what exactly managers knew and when they knew it, the role and duties of any managers with knowledge, and the expected actions that knowledge should impel for someone in that role. *See McArthur Jersey Farm Dairy*, 240 So. 2d at 201; *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 359 (Fla. 3d DCA 2001).[2]

---

[2]   Florida law generally imputes to a corporation the knowledge of an agent acting on its behalf where a deal or transaction with a third party is concerned. *Mut. Life Ins. Co. of New York v. Hilton-Green*, 241 U.S. 613, 622 (1916). An exception exists for circumstances in which the

In this case, both parties agree that McKenzie's negligent retention claim hinges on whether Jane Doe's experience with Coach Aranda in 2014 could provide actual or constructive notice to Defendants that he was unfit to coach young women unmonitored. (Doc. 96, p. 13; Doc. 108, p. 3). Defendants argue Jane Doe's personal decision not to report her own assault precludes liability as a matter of law. (Doc. 96, pp. 13–18). McKenzie responds that the record is replete with information from which a reasonable jury may conclude Jane Doe's knowledge qualified as notice and her failure to take *any* action regarding Coach Aranda was unreasonable. (Doc. 108, pp. 12–16). The Court agrees with McKenzie.

First, there is a genuine issue of material fact regarding the extent of Jane Doe's managerial role and duties. When an agent is on notice—or has reason to know—of a fact material to the agent's duties to the principal, knowledge of that fact is imputed to the principal. *Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675, 685 (11th Cir. 2018) (citing *Restatement (Third) of Agency* § 5.03 cmt. e (2006)); *see also United States v. Planes*, 8:18-CV-2726-T-23-TGW, 2019 WL 3024895, at

---

third party knows or should know the agent "has a motive or interest in concealing the facts from [her] principal." *Lambert v. Heaton*, 134 So. 2d 536, 538–39 (Fla. 1st DCA 1961). While instructive and sometimes persuasive, the agency law principles regarding imputed knowledge do not neatly dovetail with the concept of notice for purposes of negligent retention. For one, the general rule regarding imputed knowledge developed to govern liability for representations made by an agent to a third party, usually while negotiating a deal or transaction for the principal. *E.g.*, *Mut. Life Ins. Co. of New York*, 241 U.S. at 622 ("The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest."). This case does not concern representations made by an agent to a third party, and the relevant inquiry is not whether Jane Doe was acting for her employer's benefit, but rather whether she acted reasonably given her position, job duties, and the extent of her knowledge. *Compare Lambert*, 134 So. 2d at 538–39, *with McArthur Jersey Farm Dairy*, 240 So. 2d at 201.

*9 (M.D. Fla. July 11, 2019) (noting knowledge is imputed even if the agent acquired the knowledge "casually or through experiences" separate from the performance of a duty for the principal). While Jane Doe was only a coordinator when she was assaulted in 2014, USTA PD promoted her to a management position in 2017 when she became Manager of Player Development Events & Programming. (Doc. 95-18; Doc. 104-1, 10:2–5). This new role made her a mandatory reporter of sexual misconduct under the SafeSport Code and she received training regarding this responsibility starting in 2017 after her promotion. (Doc. 95, ¶ 55; Doc. 95-1, 109:10–12; Doc. 95-3, 20:25–23:15; Doc. 95-16, 26:14–18; Doc. 108-5, 86:22–87:3). Lauren Tracey, the corporate representative for Defendants, averred that Jane Doe did not manage players or coaches. (Doc. 97-7, ¶ 29). Jane Doe said herself she does not "work in the coaching space" and though she was aware that Coach Aranda worked with female athletes, whether he was training female athletes in remote parts of the USTA National Campus was "not relevant to [her] role." (Doc. 104-1, 59:9–11, 60:8–16).

Still, McKenzie and fellow player CiCi Bellis felt Jane Doe was an appropriate person at USTA to whom to report Coach Aranda's assault. (Doc. 95-11, 173:18–22). USTA immediately suspended Coach Aranda and restricted his access to its facilities in response to Jane Doe relaying to USTA executives what McKenzie said—which was her duty as a mandatory reporter. (Doc. 95, ¶ 26; Doc. 104-1, 57:19–23, 62:22–25; Doc. 104-4, p. 103). Other USTA employees reported to Jane Doe as their direct supervisor. (Doc. 108-4). She was a "leading force" in

creating a fellowship program for players, which included pairing participants with a USTA coach to serve as a mentor. (Doc. 108-1, p. 1). She has also been in charge of creating and managing events involving high-performance coaching and education programs, which were held at major USTA-sponsored tournaments. (Doc. 108-2). Defendants hold Jane Doe out as an expert on mentorship of athletes, providing her as a keynote speaker on the topic. (Doc. 108-3, pp. 1, 22–30). A reasonable jury could find from these facts that Jane Doe served in a position where her knowledge of her own assault could constitute notice or reason to know for Defendants.

Second, Jane Doe's knowledge of her assault does not, as a matter of law, provide insufficient notice of Coach Aranda's propensity for sexual misconduct. Prior incidents of misconduct known to an employer must have a sufficient nexus to the wrongdoing at issue such that it is a harbinger of the risk an employee would foreseeably engage in it. *See Garcia*, 492 So. 2d at 441 (noting "an employer who learns of an employee's conviction for petit theft cannot be deemed liable, on the basis of negligent retention upon constructive or actual notice of that crime, for the employee's subsequent rape of a customer"); *Dickinson v. Gonzalez*, 839 So. 2d 709, 714 (Fla. 3d DCA 2003). Here, USTA executives said that they would want to know of incidents like the one between Jane Doe and Coach Aranda so they could take corrective action, which could include termination. (Doc. 95-3, 22:6–23:15 ("If I knew of an incident like that, I would report it . . . ."); Doc. 95-7, 31:22–32:16, 37:10 (explaining that any information of "egregious behavior" from employees

could be "cause of termination"); Doc. 95-12, 22:22–25, 25:10–26:20 ("[I]f they think it's disrespectful, then I would expect them to report it to me.")). With Jane Doe, Coach Aranda was "grinding up on her" on a dance floor and "rubbing her vagina, on the outside of her clothes." (Doc. 104-4, pp. 13, 29). With McKenzie, he pressed himself against her back while practicing serves and then, while sitting on a courtside bench, rubbed his hand on her vagina outside her clothes. (Doc. 95-1, 40:22–41:16; Doc. 98-9, pp. 5, 80). Viewing the facts in the light most favorable to the plaintiff, it is not unreasonable to conclude that Coach Aranda's willingness to engage in sexual misconduct with one woman, a USTA employee, would make the same misconduct a foreseeable risk to another, a player.

In arguing the contrary, Defendants point to a South Carolina case holding a coworker's informal report to her supervisor, relaying that a bus driver once "grabbed [her] arms . . . like he was forcing [her] to kiss him," did not constitute sufficient notice to the employer that the driver would abuse a disabled bus passenger over several months by "repeatedly touch[ing] her legs inappropriately, kiss[ing] her and ma[king] persistent comments to her of a sexual nature[.]" *Doe v. ATC, Inc.*, 624 S.E.2d 447, 448–49 (S.C. Ct. App. 2005) ("While it is true that both incidents may generally be described as sexual in nature, the totality of the prior incident is a far cry from the reprehensible, persistent pattern of abuse against [the plaintiff]."). That case, which does not bind this Court, is distinguishable from the circumstances here. Unlike the bus company, which chose not to fire the bus driver sooner based largely on the informal nature of the

coworker's report, Defendants would have probably fired Coach Aranda (or at least supervised him more closely) if Jane Doe had chosen to raise any concerns about him engaging in sexual misconduct. (Doc. 95-7, 31:22–32:16, 37:10; Doc 95-12, 20:2–23). Coach Aranda's behavior toward Jane Doe in a nightclub is not "a far cry" from the behavior he exhibited toward McKenzie on a secluded tennis court. The difference in setting and the fact Jane Doe was not an athlete do not make Coach Aranda's prior assault insufficient as a matter of law to serve as notice of a foreseeable risk. *See Tallahassee Furniture*, 583 So. 2d at 754 (holding deliveryman's prior criminal record for theft, plus management's knowledge of his substantial on-the-clock drug use and of his prior commitment to a psychiatric hospital, created a fact issue regarding notice that he would assault a customer). The question of foreseeability and proximate cause "is concerned with the specific, narrow factual details of the case" and normally should be answered by the jury. *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992).

Third, a reasonable jury could conclude Jane Doe's decision not to take any action in light of her encounter with Coach Aranda crossed the line into being unreasonable. Defendants stress that victims of sexual assault are usually not required to report their own abuse and Jane Doe's decision not to report her abuse was personal and not for the benefit of USTA. (Doc. 96, pp. 13, 15–16). "A principal may not rebut the imputation of an agent's notice of a fact by establishing that the agent kept silent." *Restatement 3d Agency* § 5.03 cmt. b. In 2018, the SafeSport Code commanded "Covered Adults *must* report to the [Center] conduct of which

they become aware that could constitute (a) sexual misconduct[.]" (Doc. 95-6, p. 16). The parties' experts describe Coach Aranda's behavior with Jane Doe as coming within the definition of "sexual misconduct." (Doc. 97-3, 63:15; Doc. 117-1, 65:7–15). However, the Center believes no victim is required to report her own abuse, codifying this belief in more recent versions of the SafeSport Code.[3] (Doc. 97-8, ¶ 7). It is undisputed that Jane Doe kept her prior assault to herself until after McKenzie fell victim to Coach Aranda's misconduct. (Doc. 104-1, 17:14–16, 53:14–20). She did so because she was "ashamed and embarrassed." (*Id.*). Defendants' executives had received no other reports of misconduct by Coach Aranda prior to McKenzie's assault. (Doc. 97-7, ¶ 16). These facts could support a conclusion that Jane Doe, and by extension Defendants, acted reasonably. On the other hand, Jane Doe also could have taken steps short of fully disclosing Coach Aranda assaulted her—like anonymously reporting his misconduct to the USTA reporting hotline or expressing concern to an executive about him working with female athletes alone. (Doc. 95-5, pp. 60–61; Doc. 108-6). It is for a jury to decide whether Jane Doe acted reasonably in choosing not to do so. *See Garcia*, 492 So. 2d at 441.

Last, Defendants claim the record clearly shows they adequately supervised Coach Aranda's training with female athletes. (Doc. 96, pp. 9–11). Coach Aranda was SafeSport certified and had been subject to two background checks, which

---

[3]   That said, Jane Doe chose to accept a promotion which made her a mandatory reporter of sexual misconduct under the SafeSport Code and for which she received training regarding this responsibility starting in 2017. Jane Doe lost the option of keeping silent when she accepted the promotion.

were clear. (Doc. 95, ¶¶ 18–19; Doc. 97-7, ¶¶ 6, 12). The National Campus has an open plan with cameras on every court, so it is easy for supervisors and bystanders to observe the training going on. (Doc. 97-7, ¶ 16). Plaintiff's expert described the open environment as "laudable" and said USTA PD "had ample mechanisms to supervise electronically through the videotapes." (Doc. 117-1, 49:1–6, 49:25–50:3). While serving as head of women's tennis and Coach Aranda's direct supervisor, Ola Malmqvist would routinely walk the courts to observe practices. (Doc. 95-12, 13:19–14:12, 17:13–25). When he was not traveling, Malmqvist said he would "watch practice every single day, morning and afternoon," that he would give input to the coaches and players, and that he would observe practices "randomly so they [did not] know when [he was] coming." (*Id.* 17:16–25). Even while traveling, he said he would stream practices from the cameras remotely, often without telling the coaches when he planned to do so. (*Id.* 31:19–32:13).

While USTA may have had "laudable" mechanisms in place, McKenzie is quick to point out they either did not work and or were easy for Coach Aranda to evade. Notwithstanding the cameras and open plan, Coach Aranda was able to get McKenzie alone on a court where he was sure he would not be monitored. The cameras were known for "ongoing problems" and malfunctions. (Doc. 95-3, 15:22–16:2). Coach Aranda scheduled practice with McKenzie between 11 a.m. and 1 p.m., when there was "literally no one else" around, on a secluded court where he knew the camera was not working. (Doc. 95-1, 40:22–41:16; Doc. 104-4, pp. 5, 80). He had reserved that specific court with a broken camera for the same time period the

two days preceding the assault, as well. (Doc. 104-4, p. 12). Defendants did not ensure McKenzie's practices were recorded until after her assault and they later confirmed the court's camera was not turned on that day. (*Id.* at pp. 5, 81). McKenzie's assault also occurred during a period of transition following Malmqvist's promotion out of the supervisory role in October 2018. (Doc. 95-12, 16:3–19; Doc. 104-4, p. 39). Kathi Rinaldi, his replacement, said she could not recall whether she was given any training or instruction on how to supervise the coaches, whether her supervisory duties differed from Malmqvist's duties, what days she was responsible for supervising Coach Aranda, or how many hours she dedicated to that task. (Doc. 108-7, 16:7–22, 22:5–9, 23:9–14, 24:2–6). She was also out of the country in the weeks before McKenzie's assault. (*Id.* 18:18–21:8, 25:2–25, 26:2–10, 27:3–14). Rinaldi could not recall whether she delegated her supervisory responsibilities over Coach Aranda to someone else while she was away. (*Id.* 32:2–7). In light of these facts, the Court cannot say as a matter of law that Defendants adequately supervised Coach Aranda.

In sum, the record on the issue of negligent retention and supervision does not lean so far in one direction as to be the only conclusion a reasonable jury could reach. Accordingly, Defendants Motion for Summary Judgment (Doc. 96) is denied as to Count I.

**B.    Counts II & III - Battery and Intentional Infliction of Emotional Distress**

Generally, employers are not liable for criminal or tortious acts committed by their employees, "unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer." *Iglesia*, 783 So. 2d at 356. In that case, employers can be held vicariously liable if the employee was acting within the course and scope of his employment, and for the benefit of the employer. *Id.* at 357. Tortious conduct is in the scope of employment when "(1) the conduct is of the kind [the individual] was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master." *Sussman v. Fla. E. Coast Props., Inc.*, 557 So. 2d 74, 75–76 (Fla. 3d DCA 1990). Florida courts generally hold sexual assaults and batteries by employees "to be outside the scope of an employee's employment and, therefore, insufficient to impose vicarious liability on the employer." *Special Olympics Fla., Inc. v. Showalter*, 6 So. 3d 662, 665 (Fla. 5th DCA 2009) (citing *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985)). An exception exists where "the tortfeasor was assisted in accomplishing the tort by virtue of the employer/employee relationship." *Iglesia*, 783 So. 2d at 357; *Nazareth*, 467 So. 2d at 1078 (citing *Restatement (Second) of Agency* § 219(2)(d) (1958)).

Here, McKenzie asserts that the issues regarding the scope of employment and the exception pose jury questions. (Doc. 108, pp. 22–24). Normally, the jury should resolve whether an employee was acting within the scope of his employment. *M.V. by & through W.W. v. Gulf Ridge Council Boy Scouts of Am., Inc.*, 529 So. 2d 1248, 1249 (Fla. 2d DCA 1988). As told by McKenzie, Coach Aranda "engaged in an escalation of inappropriate conduct towards" her, all during training sessions on USTA-controlled property to provide the coaching USTA hired him to perform. (Doc. 98-8; Doc. 104-4, p. 117; Doc. 104-5, p. 4). Under the guise of working on McKenzie's serving technique, he started "holding her hips from behind," "pressing his body up against the back of her body hard and harder," placing his hands on "her hips, until they were in her groin area [] at the edge of her underwear," and sliding his hands "down to her underwear line right next to her vagina." (Doc. 98-1, ¶¶ 20–24; Doc. 95-11, 154:2–164:25; Doc. 104-5, p. 3). Immediately following the assault, Coach Aranda told McKenzie he could elevate her career—like by attracting sponsors—if she continued training with him as her coach. (Doc. 95-11, 167:10–25). McKenzie presses that she would not have been on the courts with Coach Aranda practicing serves but for his USTA employment and his assignment to train her.

That all notwithstanding, Coach Aranda's conduct must bear some relation to "the real or apparent scope of his employment or to the interest of his employer" for Defendants to be vicariously liable. *City of Green Cove Springs v. Donaldson*,

348 F.2d 197, 202 (5th Cir. 1965) (interpreting Florida law). [4] An employer/employee relationship assists with the tortious conduct when the employee uses his authority to enable that very conduct during the time it occurred—not just because the tortfeasor was there and had access to the plaintiff due to his employment. *Compare United States Equal Employment Opportunity Comm'n v. Favorite Farms, Inc.*, 8:17-CV-1292-T-30-AAS, 2018 WL 4698457, at *3 (M.D. Fla. Oct. 1, 2018) (denying summary judgment on vicarious liability where jury could find assailant "used his authority as [the victim's] supervisor" and his purview to inspect housing units "to gain access to her apartment in order to sexually assault her"), *and Hennagan v. Dep't of High. Saf. & Motor Veh.*, 467 So. 2d 748, 750 (Fla. 1st DCA 1985) (reversing dismissal where a trooper pretextually arrested a minor as a shoplifting suspect and then molested her), *with Iglesia*, 783 So. 2d at 358 (reversing denial of directed verdict for church because, "[w]hile [assailant] may have had access to [plaintiff] because of his position as the Church pastor, . . . he was not engaging in authorized acts or serving the interests of the Church during the time he tried to seduce her or on the day he raped her"), *and Showalter*, 6 So. 3d at 665 (reversing denial of directed verdict for defendant since Special Olympics volunteer acted outside his apparent authority in luring children to his van in a bowling alley parking lot and molesting them). Even when the employment envisions physical contact, the tortious conduct must still be

---

[4] The Eleventh Circuit holds cases handed down by the Fifth Circuit prior to October 1, 1981 shall constitute binding precedent unless overruled en banc. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

connected to the job-related purpose authorizing physical contact in order for the employer to be vicarious liable. *See Goss v. Hum. Servs. Assocs., Inc.*, 79 So. 3d 127, 132 (Fla. 5th DCA 2012) (finding a counselor tasked with rehabilitating troubled youths at a group home, in part through "physical encouragement in the form of hugging and hand-holding," was not aided by her employment in having sex with one of the youths outside of any counseling). In other words, the employee must be able to cause the harm because of his position with the employer for the exception to apply. *See Restatement (Second) of Agency* § 219 cmt. e.

Considering these principles, a reasonable jury could find Coach Aranda was aided in accomplishing the torts by virtue of his position. Admittedly, this case is a close call. Defendants employed Coach Aranda to train players, not to sexually assault them. (Doc. 104-4, p. 117). In her testimony, McKenzie said Coach Aranda's tortious conduct was not normal. (Doc. 95-11). On the day of the incident, she and Coach Aranda had a "normal practice until the serving at the end," she said. (*Id.* 160:10–11). In describing her reaction to Coach Aranda's conduct in the weeks before the assault, McKenzie made remarks such as, "I would never think that a coach would do that." (*Id.* 137:11–20). Like when Coach Aranda would sit on the bench next to her and rest his hand on her thigh, she said she "wouldn't expect for something like that to happen." (*Id.* 140:22–141:25, 142:6–8).

Still, a jury could find Coach Aranda used the authority of his position to dictate practice—with the pretext of practicing serving technique—so as to escalate his inappropriate touching over a period of weeks culminating in the assault. *See*

*Hennagan*, 467 So. 2d at 750. Because of his position, he decided the time and court on which McKenzie would train with him. (Doc. 104-4, pp. 9–13). Other coaches were not readily available to provide consistent training. (*Id.*). McKenzie's ability to continue participating in the player development program, already somewhat precarious at the time, hinged on the coaches' view of her work ethic and performance. (Doc. 104-4, pp. 9, 34–35). Since Coach Aranda could only hold practice with McKenzie and train her on serving technique by virtue of his employment, there is a genuine dispute of material fact regarding whether the exception applies. *See Favorite Farms*, 2018 WL 4698457, at *3. Defendants' Motion for Summary Judgment (Doc. 96) is denied as to Counts II and III.

### C.   Count IV – Negligence

To succeed on a negligence claim under Florida law, a plaintiff must establish: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached said duty; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the breach caused the plaintiff to suffer damages." *See Clay Elec. Coop, Inc. v. Johnson*, 875 So. 2d 1182, 1185 (Fla. 2003). McKenzie seeks summary judgment on the first element, asking the Court to find Defendants owe players in their training program an affirmative duty of care to protect them from sexual assaults committed by coaches, which Defendants oppose. (Doc. 98, pp. 12–14; Doc. 112). Whether a particular defendant owes a duty of care is a question of law resolvable on summary judgment. *McCain*, 593 So. 2d at 502.

A duty is established when the acts of a defendant in a particular case "create a foreseeable zone of risk." *Pate v. Threlkel*, 661 So. 2d 278, 280 (Fla. 1995). Additionally, "one who undertakes to act, even when under no obligation to do so, thereby becomes obligated to act with reasonable care." *Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64, 66–67 (Fla. 1996). Under the common law, a person or other entity generally has no duty to take precautions to protect another against criminal acts of third parties. *Boynton v. Burglass*, 590 So. 2d 446, 448 (Fla. 3d DCA 1991). An exception exists when there is a "special relationship" between the defendant and the person whose behavior needs to be controlled or the person who is a foreseeable victim of that conduct. *Id.* "A special relationship typically arises in narrow circumstances where the relationship places the defendant in a superior position to control the risk, such as where the defendant has substantial control over the plaintiff so as to deprive the plaintiff of his or her normal opportunities for protection." *Saunders v. Baseball Factory, Inc.*, 361 So. 3d 365, 370 (Fla. 4th DCA 2023) (citing *Restatement (Second) of Torts* § 314A (1965)).

Athletic programs can have a special relationship with players in their custody which imposes a duty to exercise reasonable care to prevent third parties from intentionally harming those players or conducting themselves so as to create an unreasonable risk of harm. *See Showalter*, 6 So. 3d at 666–67 (citing *Restatement (Second) of Torts* § 320 (1965)). This special relationship arises when these programs voluntarily take custody of players under circumstances that deprive the players of normal opportunities for protection or that subject them to

association with persons likely to harm them. *Id.* Florida law recognizes this sort of special relationship exists between a school and its students. *Rupp v. Bryant*, 417 So. 2d 658, 666 (Fla. 1982) (holding public schools owe a general duty of supervision to the minor students placed within their care). Applying similar principles, the Florida Supreme Court extends to universities a duty to use ordinary care to protect its adult students over whom it is exercising some degree of control from foreseeable harm in providing educational services and programs, like when assigning them to mandatory internship programs. *Nova Se. Univ., Inc. v. Gross*, 758 So. 2d 86, 88 (Fla. 2000). McKenzie argues the relationship between Defendants and young players like her, who USTA officials recruit to leave home and train with USTA coaches at USTA facilities, mirrors the special relationship from which a university's duty to its adult students arises—engendering an affirmative duty to protect players in its training program from sexual assault. (Doc. 98, p. 18). The Court agrees.

To start with, Defendants are fully aware that sexual abuse of athletes is a pervasive problem in amateur sports. (Doc. 108-9). USTA specifically documented 31 reports of sexual abuse within tennis between 2013 and 2018. (Docs. 108-10, 108-11). The issue has spawned federal legislation like the Safe Sport Authorization Act of 2017 with the goal of creating oversight for the USOC and NGBs while also implementing policies and procedures to prevent sexual abuse. 36 U.S.C. § 220541(1)(B). Defendants have acknowledged that sexual relationships between coaches and players were historically prevalent in tennis, and USTA acceded to a

prohibition on those relationships by 2017 because the power imbalance in the athlete-coach dynamic creates substantial risk for abuse. (Doc. 95-5, p. 69; Doc. 98-7). To prevent this sort of abuse, USTA's Safe Play program provides that adults should not be completely alone with players who are minors. (Doc. 95-5, p. 59).[5]

With the risk of sexual misconduct by coaches sharply defined, Defendants undertake the USTA Player Development Program, recruiting top-performing American athletes to train at USTA facilities under coaches employed and assigned to them by USTA. (Doc 95-3, 11:24–12:6; Doc. 98-1, ¶¶ 2–13; Doc. 126-1, ¶¶ 1–2). A USTA coach recruited McKenzie into the program when she was 12 years old. (Doc. 126-1, p. 4). She received significant financial support and grants while in the program. (*Id.* at pp. 6–10). When McKenzie returned to the training program in 2018 after an extended time away to rehab a shoulder injury, she understood that her continued participation in it, including access to USTA's support and resources, hinged on her ability to return to competition and perform. (*Id.* ¶ 5; Doc. 104-4, pp. 9, 34–35). Her coaches—including Coach Aranda—would have at least some say in her ability to continue training with the USTA and receiving support. (Doc. 104-4, pp. 9, 34–35). Though McKenzie was free to compete in non-USTA tournaments and could choose to pay for her own private coach, Defendants maintained ultimate control over her participation in USTA competitions and their training program, including what resources would be available to her in the future

---

[5] This is not to say that that Defendants owe the same duty to minor players as they do to adults, but rather to show Defendants are aware that abuse by coaches at any age requires seclusion. (*See* Doc. 108-8).

and who would be selected to coach and train her. (*Id.*; Doc. 98-1, ¶ 13; Doc. 95-3, 14:18–22). She continued her participation in the program until the pandemic shutdowns in 2020, after which she received a phone call from Kathi Rinaldi telling her she would not be invited back. (Doc. 126-1, ¶¶ 6–8).

Pairing players with coaches to train in this environment creates a zone of foreseeable risk of sexual abuse. (*E.g.*, Doc. 95-5, p. 59; Doc. 97-3, p. 74; Doc. 117-1, p. 74). After all, Defendants implement their Safe Play program and endeavor to have "all practices conducted by USTA coaches [] videotaped" in an open facility for a reason. (Doc. 95-3, 15:13–14). Since USTA controls both the facility and its coaches for those athletes in its training program, players like McKenzie rely on Defendants to take reasonable steps to prevent opportunities for abuse from presenting themselves during training sessions and events, like limiting instances in which a coach and player can be alone and wholly unmonitored, which is the hallmark of special relationship. *See Showalter*, 6 So. 3d at 666–67. In this case specifically, the special relationship imposes on Defendants only a duty of reasonable care to protect players in their training program from sexual abuse by their coaches—a foreseeable harm. *See id.*; *Gross*, 758 So. 2d at 88; *T.W. v. Regal Trace, Ltd.*, 908 So. 2d 499, 506 (Fla. 4th DCA 2005) (citing *Gross* in finding landlords have a duty to protect their tenants from sexual assault). The relationship does *not* impose a heightened duty to make every effort so that abuse is impossible. *See Saunders,* 361 So. 3d at 370. Accordingly, Plaintiff's Motion for

Partial Summary Judgment (Doc. 98) is granted insofar as it is consistent with this opinion.

In seeking summary judgment rejecting this claim, Defendants again contend they exercised ordinary care by implementing the Safe Play program and the other supervisory mechanisms in place at the National Campus. (Doc. 96, pp. 26–27). A jury could reasonably think so. But issues of breach and causation are for the jury to decide. *McCain*, 593 So. 2d at 504. At this stage, Defendants do not present sufficient undisputed evidence—not even the statements of McKenzie's expert lauding USTA's supervisory measures—that could keep a reasonable jury from concluding Defendants breached their duty by leaving unfettered Coach Aranda's ability to schedule practice on a secluded court he knew lacked a working camera at a time when no one else would be around three days in a row, and that he would not have been able to assault McKenzie but for those lapses. (Doc. 104-4, pp. 5, 12, 80). As such, Defendants' Motion for Summary Judgment (Doc. 96) is denied as to Count IV.

### D.    Count V - Punitive Damages

"A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." FLA. STAT. § 768.72(2). To be "clear and convincing," evidence "must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Acevedo v. State*, 787 So. 2d 127,

130 (Fla. 3d DCA 2001). Punitive damages may be imposed on a corporation for conduct of an employee only if an employee was personally guilty of intentional misconduct or gross negligence and (1) "the employer, principal, corporation, or other legal entity actively and knowingly participated in such conduct," (2) "the officers, directors, or managers of the corporation knowingly condoned, ratified, or consented to the conduct," or (3) "the employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant." § 768.72(3)(a)–(c). "To avoid summary judgment, Plaintiff must point to evidence that would allow a reasonable jury, applying the clear and convincing standard, to find that punitive damages are appropriate." *Thelen v. Somatics, LLC*, 8:20-CV-1724-TPB-JSS, 2023 WL 3338221, at *7 (M.D. Fla. May 5, 2023).

Here, there is no dispute that Coach Aranda engaged in intentional misconduct. According to McKenzie, Defendants' officers, directors, and managers knowingly condoned, ratified, or consented to the conduct through fostering a culture of sexual misconduct between coaches and players—resisting policies that restrict relationships between them for years and seeking to silence victims of sexual misconduct. (Doc. 108, pp. 23–25). The USTA knew about sexual misconduct occurring within the sport prior to McKenzie's assault. (Doc. 108-10).[6]

---

[6]  One of those incidents seems to have involved Douglas Booth, former USTA Florida Executive Director, who resigned in late 2017. (Doc. 108-11, p. 1). It is unclear from the record how many of those incidents involved USTA coaches because incidents involving known USTA employees (i.e., Booth and Coach Aranda) have their club affiliation denoted as "unknown"

In 2012, the USTA's managing director wrote a letter to the USOC opposing mandatory minimum Safe Sport standards for all NGBs, expressing concerns about "unfunded mandates" and increased liability exposure. (Doc. 98-4). In 2014, the USTA's executive director and chief operating officer spoke before the USOC to oppose a single mandatory national body overseeing abuse prevention and suggested an NGB be allowed to opt out if the NGB meets the Safe Sport standards on its own. (Doc. 98-5, p. 3). Marking up the USOC's draft minimum standards, the USTA's Director of Ethics and Safe Sport said a restriction on romantic relationships between players and coaches "is not realistic in tennis" because "MANY female players date their own or other coaches[.]" (Doc. 98-7, p. 1). Pam Shriver, a high-profile Olympic gold medalist for tennis and former president of the USTA's charitable foundation (the "**Foundation**"), has spoken out publicly against these relationships as abusive and harmful, having entered one herself when she was 17 years old. (Doc. 108-5, 17:5–9, 25:1–25, 29:6–25). As an expert on tennis, Shriver testified the problem has been wide-spread and she encountered abusive coaching relationships "each and every year on the [Women's Tennis Association] Tour" since she began in 1978, saying she witnessed "too many to count." (*Id.* 32:24–25, 33:17–22, 37:25). At a Foundation charity event, USTA's senior executive and corporate counsel, Staciellen Mischel, approached Shriver to caution her against speaking out about her personal experience with abuse by

---

on Defendants' disclosed list of incidents. (*Id.*). The list also does not indicate whether the victims were players.

coaches within tennis, including a "warning" against speaking with McKenzie's counsel in this case. (*Id.* 52:15–24, 64:13–16). Shriver took this to mean, "Don't say too much." (*Id.* 64:16).

According to McKenzie, Defendants did not ban sexual relationships between players and coaches until 2019—a claim based solely on an email to USTA staff that year from Martin Blackman, then-USTA PD general manager, prohibiting relationships between athletes and all staff members "effective immediately." (Doc. 108-8). But there is no dispute that USTA had adopted a policy by 2017 prohibiting coaches and players from engaging in sexual relationships, more than a year before McKenzie's assault. (Doc. 95-1, pp. 322–23, 334; Doc. 95-5, p. 69). That policy unambiguously applies to USTA coaches. (Doc. 95-1, pp. 322–23; Doc. 95-5, pp. 50–51) ("Covered Individual"). McKenzie cites the 2019 email as proof Defendants "failed to implement protections for athletes" and "fought to protect the ability of coaches to abuse their positions of power to manipulate young and impressionable athletes." (Doc. 108, p. 25).

In the end, McKenzie presents evidence sufficient to create a triable issue of fact on punitive damages. For example, McKenzie establishes that Jane Doe had personal knowledge of Coach Aranda's propensity to engage in sexually abusive conduct, and she failed to report these tendencies after assuming a managerial role that provided for mandatory reporting of sexual misconduct. A reasonable jury could conclude that Jane Does' failure to report Coach Aranda's misconduct and the flaws in security at the USTA facility would have led Coach Aranda (or any

other USTA coach) to believe he could make the sexual advances he did during a training session without severe consequences. And USTA did not ban relationships between athletes and all its staff members until 2019, even after the NGB had adopted a policy by 2017 prohibiting coaches and players from engaging in sexual relationships. (Doc. 95-5, p. 69; Doc. 108-8). McKenzie thus presents enough evidence for a jury to conclude that a culture of sexual misconduct between coaches and players existed *in the training program* for Defendants to foster. *See Speedway SuperAmerica, LLC v. Dupont*, 933 So. 2d 75, 91 (Fla. 5th DCA 2006). And USTA counsel's approach and message to Shriver certainly looks like an untoward attempt to intimidate her and may be construed by the jury as being aimed at silencing victims of abuse by coaches. *See Termilus v. Marksman Sec. Corp.*, 15-61758-CIV, 2016 WL 6212990, at *11 (S.D. Fla. June 27, 2016), *report and recommendation adopted as modified*, 2016 WL 6237264 (S.D. Fla. Sept. 1, 2016). Punitive damages are only tenable for "truly culpable behavior to express society's collective outrage." *Bistline v. Rogers*, 215 So. 3d 607, 609 (Fla. 4th DCA 2017) (cleaned up). McKenzie presents sufficient evidence from which a jury may conclude an award of punitive damages is warranted. That being the case, Defendants' Motion for Summary Judgment (Doc. 96) is denied as to Count V.

## IV.   CONCLUSION

Accordingly, it is **ORDERED** that:

1.     Defendants' Motion for Summary Judgment (Doc. 96) is **DENIED**.

2.     Plaintiff's Motion for Partial Summary Judgment (Doc. 98) is

**GRANTED** consistent with this opinion.

**DONE AND ORDERED** in Orlando, Florida on February 16, 2024.


PAUL G. BYRON
UNITED STATES DISTRICT JUDGE


Copies furnished to:

Counsel of Record
Unrepresented Parties